**Donald Ray SMITH**

v.

**BORDEN, INC., et al.**

**No. Civ.A. 97–677–C–M2.**

United States District Court,
M.D. Louisiana.

Sept. 2, 1999.

Sean D. Fagan, Peyton P. Murphy, Murphy Law Firm, Baton Rouge, LA, for Donald Ray Smith.

Dwight C. Paulsen III, Lawrence J. Hand, Jr., Michael S. Sepcich, Robert S. Emmett, Lemle & Kelleher, for The Sherwin–Williams Company.

## RULING

NOLAND, United States Magistrate Judge.

This matter is before the Court on the Motion to Exclude Testimony of Plaintiff's Experts filed by defendant The Sherwin–Williams Company. (R. Doc. 150.) By this motion, Sherwin–Williams seeks to exclude the testimony of three expert witnesses the plaintiff intends to call at trial. Sherwin–Williams contends that under Fed.R.Evid. 702, the expert testimony the plaintiff in-

tends to offer will not "assist the trier of fact" and thus should be excluded.

## FACTS AND PROCEDURAL HISTORY

This is a products-liability lawsuit. The plaintiff claims that he was using the defendant's aerosol battery protector when the product's metal can came into contact with the battery's positive terminal. An electrical arc caused a fire, and the plaintiff was burned.

At issue in this motion is the plaintiff's claim that the battery protector's metal can was defectively designed. To prove this claim, the plaintiff intends to call three expert witnesses, who, according to their depositions, will offer testimony as follows:

(1) Robert Nethken, a mechanical engineer and electrical engineer, will testify that the product was deficient in three ways.

First, Nethken says, the can is too large. Nethken testified that because of the can's size, it is difficult to maneuver in a tight area, such as when a person works on a car battery. Consequently, he suggests, the larger can is more likely to come into contact with the battery's positive terminal than a smaller can.

Second, Nethken claims the can had insufficient insulation because its cover was made of a thin, fragile paper. This kind of paper can easily be torn. When this occurs, Nethken says, the paper's insulating ability suffers.

Finally, Nethken says, the can had an exposed bottom. He believes the product needed some type of plastic insulating cap to prevent contact arcing.

(2) Andrew McPhate, a mechanical engineer and design engineer, will give testimony similar to Nethken's in that McPhate believes the product was defective because of the can's exposed bottom. McPhate believes the accident could have been prevented by having some type of plastic cap on the bottom of the can. McPhate also will testify that the accident could have been prevented by a more durable label.

(3) Frank Johnson, a mechanical and electrical engineer, will testify essentially in ac-

cord with the opinions that McPhate and Nethken have offered.

The defendant bases its opposition to the introduction of this testimony on its contention that none of the experts: (1) have any experience in aerosol can design, (2) performed any tests to support their opinions and (3) relied on any scientific literature or treatises to validate their conclusions.

## ANALYSIS

Fed.R.Evid. 702 provides that if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court must examine whether the expert will testify to scientific or technical knowledge that will assist the trier of fact to understand or determine a fact in issue. "[T]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 113 S.Ct. at 2796, 113 S.Ct. 2786. The key to this test "is whether the expert's hypothesis can be and has been tested." *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir.1994). The second factor is whether the hypothesis has been subjected to peer review or publication. *Id.* A court also should consider the known rates of error and maintenance of standards of the expert's methodology, if any. *Daubert,* 113 S.Ct. at 2797. Finally, a court also should consider whether the theory, or the technique used to develop the theory, is generally accepted within the relevant community. *Id.*

This role requires the district court to undertake a two-part analysis. The district court first must determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid. *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir.1999).

Second, the district court must determine whether the reasoning or methodology can be properly applied to the facts in issue—that is, whether it is relevant. *Id.*

*Daubert* had led to some confusion in the federal courts as to whether its standards applied to cases that featured non-scientific expert testimony. The Supreme Court settled this issue in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) In *Kumho,* the court said *Daubert's* general holding—that the trial judge has a "gatekeeping" obligation regarding the admission of expert testimony—applies not only to testimony based on scientific knowledge, but also to testimony based on technical and "other specialized" knowledge. In so holding, the Supreme Court said:

> We also conclude that a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine the testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho,* 119 S.Ct. at 1171, citation omitted.

Like the present case, *Kumho* involved a products liability claim. The right rear tire of the plaintiff's minivan blew out, resulting in an accident that killed one passenger. The plaintiffs sued the tire manufacturer, alleging the tire that blew out was defective. The plaintiffs based their case on the testimony of an expert in "tire failure analysis."

The expert concluded that the tire was defective. He based this conclusion in part upon three premises: (1) A tire's carcass should stay bound to the inner side of the tread for a significant period of time after its tread depth has worn away, (2) the tread of the tire in *Kumho* separated from its inner steel-belted carcass before the accident and (3) this separation caused the blowout. These conclusions were based on several other propositions that the defendant disputed.

The defendant asked the district court to exclude this testimony because it did not meet Rule 702's reliability requirement. The district court used the four *Daubert* factors to conclude that the testimony should be excluded. On reconsideration, the district court agreed that the *Daubert* factors were illustrative and should be applied flexibly. However, the court did not change its ruling that the testimony was too unreliable to be admitted. The court found the expert's methodology in analyzing data obtained from a visual inspection of the tire, and the scientific basis for that analysis, had insufficient indications of reliability. The 11th Circuit Court of Appeals reversed. The Supreme Court granted certiorari and reversed the court of appeals. In doing so, the court agreed that the *Daubert* factors should be applied flexibly.

> [*Daubert* ] made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of Daubert's general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

*Kumho,* 526 U.S. at ——, 119 S.Ct. at 1175.

The Supreme Court went on to say that a trial court should consider the specific factors identified in *Daubert* where they are "reasonable measures of the reliability of expert testimony." *Kumho,* 526 U.S. at ——, 119 S.Ct. at 1176.

In applying the combination of *Daubert* and *Kumho,* the Fifth Circuit has said that in the vast majority of cases, the district court should first decide whether the factors mentioned in *Daubert* are appropriate. *Black v. Food Lion, Inc.,* 171 F.3d 308, 311 (5th Cir. 1999). Once the court considers the *Daubert*

factors, the court then can consider whether other factors, not mentioned in *Daubert*, are relevant to the case at hand. *Id.*

■ Consequently, the Court first must consider whether the four *Daubert* factors are appropriate for use in this case. After considering the theory of the plaintiff's case and the testimony sought to be introduced, the Court finds that only the first and fourth *Daubert* factors apply to the present case. That is, the Court will consider whether (1) the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue, focusing on whether the expert's hypothesis can be and has been tested, and (2) the theory, or the technique used to develop the theory, is generally accepted within the relevant community.

Because of the nature of this case and the proffered testimony, the other two *Daubert* factors are not "reasonable measures of the reliability of expert testimony"[1] and thus do not apply. The Court finds it highly unlikely that there are any scientific journals that focus on the design of aerosol cans or battery protector delivery systems. Thus, there is little likelihood that the plaintiff's experts would have been in a position to have their theories analyzed by peers through the academic process of publication and review. For similar reasons, there is no evidence that hypotheses such as these are likely to have known rates of error and maintenance of standards. The Court is unaware of any specific discipline that focuses on testing aerosol cans to determine whether the cans pose a risk of ignition when they come into contact with an electrical source.

■ As for the factors that do apply, it is undisputed that none of the plaintiffs' experts

tested the aerosol can at issue in this lawsuit. Only Nethken, a mechanical engineer and electrical engineer, conducted any tests. Nethken testified that he tested other spray cans that use paint on their exterior instead of paper, and he found the insulation to be perfect. None of the experts attempted to perform any tests or other experiments to support their theories that the accident would not have occurred if the can had been smaller or a plastic ring or cap had been placed on the bottom of the can.[2] Despite this lack of testing, however, the Court finds that this factor does not render the proffered testimony unreliable.

On the first point, the defendant argues that none of the experts did any testing on the insulative properties of its product's label. However, all of the plaintiff's experts concede that if the paper label is intact, it is a sufficient insulator. There is no need to test what the plaintiff's experts concede works. The problem, the plaintiff's experts contend, occurs when the paper label tears. The plaintiff's experts all have sufficient experience and education to give testimony on the insulative properties of torn paper versus paint, without the need for a legion of experiments and tests.

The same analysis applies to the second and third theories. A mechanical and electrical engineer certainly possess sufficient training and education to be able to testify regarding the conductive properties of metal versus metal covered with plastic. This testimony involves no exotic theories. It involves basic scientific principles. The question of whether the inclusion of a plastic cap or ring is either necessary or feasible is a legal, not a scientific, question. Similarly, the question of whether the can should have been smaller to avoid accidental contact with

---

1. *Kumho,* 526 U.S. at ——, 119 S.Ct. at 1176.

2. There is some indication in Nethken's report that the product was defective because the battery protector itself was too flammable. However, in his deposition, Nethken acknowledged that he does not have the necessary background to comment on the substance's chemical composition, and he clarified that he was really criticizing the delivery system, rather than the substance itself. The defendant correctly observes

that Nethken admitted that if a substance is less flammable, it may not even be deliverable by aerosol spray. As a result, the Court does not believe that Nethken will contend that the product is defective because it is too flammable. To the extent, however, that Nethken were to attempt to give such testimony, the Court finds it is inadmissible under Rule 702 because Nethken himself has acknowledged that he is unqualified to comment on the substance's chemical composition.

**262**

the battery is a legal question. There is no need to scientifically test whether the can was too large. A mechanical, electrical or design engineer has sufficient education and training to be able to testify that a smaller can, which would fit into a user's hand, would reduce the risk of contact with the battery · terminal.

■ As to the second applicable *Daubert* factor—whether the experts' theories have general acceptance in the scientific community—the defendant does not seriously dispute the scientific principles underlying the three theories. There is no indication that the plaintiff's experts are advancing radical, untested scientific theories. What they have done instead is to use accepted scientific principles to contend that the aerosol can at issue in this lawsuit could have been designed in a safer fashion. The defendant presents no evidence to indicate there is anything scientifically suspect about the conclusion that a plastic cover on a piece of metal reduces the chance that contact arcing will occur. Neither is there any indication that there is any "bad science" at work in the conclusion that a painted surface provides superior insulation to a torn paper label or that a can that fits in the hand reduces the risk of contact arcing by an inadvertent bump. What the defendant really takes issue with is the necessity for any of these design changes. This is a question for the jury, and it does not involve the reliability of the experts' testimony.

■ Moreover, the Court finds nothing in the defendant's other contentions that suggest the experts' opinions are unreliable. While none of the plaintiff's experts have ever designed aerosol cans, this is not a requirement for offering expert testimony in this case. The defendant does not seriously contend there is a specific scientific or technical discipline of "aerosol can design." Neither can the defendant identify any journals or treatises in the area of "aerosol can design." Universities do not award degrees in "aerosol can design." However, there are certain scientific and engineering principles

that go into the design of an aerosol delivery system. It is the explanation of these principles, and their application to the product at issue in this case, that ultimately will be of "assistance to the trier of fact" as Rule 702 contemplates.

■ Accordingly, the defendant's Motion to Exclude Testimony of Plaintiff's Experts (R. Doc. 150) is **GRANTED IN PART AND DENIED IN PART,** in accordance with the analysis outlined above.[3]

3. The motion is granted to the extent that the plaintiff's experts will not be allowed to offer any testimony to the effect that the defendant's battery protector was too flammable (had too low a flash point).