Michael MILANOWICZ and
Lynne Milanowicz, his
wife, Plaintiffs,

v.

THE RAYMOND CORPORATION and
John Does A–Z, jointly, severally, and
in the alternative, Defendants.

No. CIV. A. 99–3102 (JEI).

United States District Court,
D. New Jersey.

July 12, 2001.

Law Offices of Gary D. Ginsberg by Gary D. Ginsberg, Mount Laurel, NJ, for Plaintiffs.

Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray by Richard B. Wickersham, Jr., Dennis P. Ziemba, Mount Laurel, NJ, for Defendant.

## OPINION

IRENAS, District Judge:

Presently before the court is Defendant The Raymond Corporation's Motion for Summary Judgment of Plaintiffs Michael and Lynne Milanowicz's products liability and consortium claims. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted.

## I. BACKGROUND

On August 20, 1997, Plaintiff Michael Milanowicz ("Plaintiff"), an employee at the General Motors Service Parts Distribution Facility in Bensalem, Pennsylvania, injured his hand while laterally adjusting the forks on a lift truck manufactured by Defendant Raymond Corporation ("Defendant" or "Raymond").

The "L"-shaped forks were mounted on pivots on the front of the lift truck. To prevent lateral movement, each fork was secured in place by a pin on the back of the vertical portion of the fork which fit into one of several holes on the front of the carriage. In order to laterally adjust each fork—to accommodate a wider or narrower load—the operator would pivot each fork upward toward the carriage to disengage the pin, shift the fork to a position in front of the desired hole, and then swing the fork down until the pin re-engaged in the new hole.

In this case, Plaintiff lowered the lift carriage onto a guardrail so as to rotate the forks up and disengage the pins, thus allowing him then to manually shift the

forks into the desired position. However, when Plaintiff raised the carriage in order to re-level the forks, one fork did not re-engage in the desired hole. Plaintiff then tried to manually manipulate the fork into the hole by shaking the end of the fork in the hope that the pin would engage. When that was not successful, Plaintiff stepped closer in towards the carriage to determine how much further the pin needed to move. Plaintiff then tried lifting and shifting the fork into place with his hands. However, in Plaintiff's words, "as I was lifting, my hand—my right hand slipped behind the fork on grease. And at the same time my hand slipped behind, [the pin] found the hold and came down and severed my finger." (Pls.' Opp. Br. Ex. A at 119–20).

On or about July 1, 1999, Plaintiffs filed a Complaint alleging products liability claims of defective design, failure to warn, and inadequate instructions for use. Plaintiff Lynne Milanowicz also sought recovery for loss of consortium, society, and services.

During discovery, it was learned that the original 48″ forks on the lift truck had, at some point prior to the accident, been replaced by 60″ forks manufactured by Dyson Corp. and distributed by Andersen & Associates. The original forks, which were manufactured by Kenhar Corp. for Defendant Raymond, featured chamfered pins designed to facilitate proper pin alignment. In other words, each pin was 1/2″ narrower at its end, thus increasing the alignment tolerance and reducing fork "hang-up." (Def.'s Supp. Br. Ex. D at 2).

In contrast, the 60″ Dyson replacement forks were designed with square shoulders and no chamfer, and thus did not conform to Raymond's design specifications. (Id.; Ex. G at 3). Evidently, however, repeated re-indexing of the forks had worn down the shoulders of the pins so that they were slightly rounded and chamfered. (Pls.' Opp. Br. Ex. C at 64–66).

Defendant's two experts, Robert N. Rogers and Michael W. Rogers, both concluded that the absence of the chamfer on the replacement Dyson forks was a significant factor in the accident. (Def.'s Supp. Br. Ex. D at 2; Ex. G at 3). Specifically, the use of nonconforming forks increased the risk of fork hang-up, and thus the risk of injury. (Id.)

Plaintiff's expert, Paul R. Stephens ("Stephens"), came to a different conclusion, finding that Raymond's fork mounting and adjustment mechanism was defective because it necessitated an "inherently hazardous procedure" to manually adjust the forks. (Pls.' Opp. Br. Ex. B at 7). As a result, it was immaterial whether the original forks or the replacement forks were used. Rather, Stephens concluded, Raymond should have designed and manufactured its lift trucks with power-operated fork-positioning mechanisms. (Id.). Stephens also determined that Raymond had failed to provide adequate instructions regarding a safe adjustment procedure and adequate warnings on the lift truck regarding the risks involved. (Id. at 8).

On or about April 23, 2001, Defendant filed the instant Motion for Summary Judgment. Defendant claims that: 1) the replacement nonconforming forks marked a substantial modification; 2) Plaintiffs cannot establish a prima facie case as to the design defect claim because their expert's report is inadmissible; and 3) Plaintiffs cannot establish a prima facie case as to the failure to warn claim because the danger was open and obvious and there was no proximate cause.

## II. STANDARD OF REVIEW

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

■ In New Jersey, to sustain a products liability claim, a plaintiff must establish "that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." [1] *Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34, 675 A.2d 620, 627 (1996) (quoting *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374, 384–85 (1984)). "Plaintiffs may show either a design defect, a manufacturing defect, or an inadequate warning defect rendering defendant's product not reasonably fit, suitable, or safe for its intended or foreseeable purposes." *Reiff v. Convergent Techs.*, 957 F.Supp. 573, 578 (D.N.J.1997) (Irenas, J.) (citing *Zaza*, 675 A.2d at 627). "Liability should be imposed only when the manufacturer is responsible for the defective condition." *Id.; see also O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298, 303 (1983) (articulating the rationale to "prevent[ ] the manufacturer from also becoming the insurer of a product"), *superseded in part by* N.J.S.A. 2A:58C–3, *as recognized inDewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 577 A.2d 1239 (1990). The meaning of "defective condition," though, is not self-evident, and courts have looked to negligence principles for assistance. *See Zaza*, 675 A.2d at 628 ("[T]he ultimate question to be resolved in design-defect and failure-to-warn cases is whether the manufacturer acted in a reasonably prudent manner in designing and fabricating a product."); *Feldman*, 479 A.2d at 385 (noting that "strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of defendant's conduct").

■ "Even if a product is properly designed and manufactured, it may still be unsafe for its intended or foreseeable uses if it is not accompanied by adequate warnings or instructions." *Reiff*, 957 F.Supp. at 581 (citing *Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 406 A.2d 140, 153 (1979)). Therefore, under New Jersey law, "[a] manufacturer has a duty to warn such foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of its product." *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 485 A.2d 305, 309 (1984). To bolster this duty, New Jersey law incorporates a "heeding presumption"—"a presumption that plaintiff would have 'heeded' or followed a warning has defendant given one." *Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710, 716–20 (1993) (adopting presumption).

---

1. Even though the accident occurred in Pennsylvania, Plaintiffs, New Jersey residents, brought suit in New Jersey. Neither side has raised a choice of law issue, and the court refrains from doing so *sua sponte*. Regardless, because the Court's grant of summary judgment is predicated on its analysis under the Federal Rules of Evidence, state law issues would not have been dispositive anyway.

## A. Substantial Modification

New Jersey courts have held manufacturers strictly liable for products, despite another's subsequent substantial alterations, when those alterations were objectively foreseeable and likely to cause injury. *See Brown v. United States Stove Co.,* 98 N.J. 155, 484 A.2d 1234, 1239–41 (1984) (requiring a product to be "suitably safe after it has been ... foreseeably altered"); *Soler v. Castmaster,* 98 N.J. 137, 484 A.2d 1225, 1232 (1984); *McDermott v. TENDUN Constructors,* 211 N.J.Super. 196, 511 A.2d 690, 698–99 (1986); *cf. Butler v. Acme Markets, Inc.,* 89 N.J. 270, 445 A.2d 1141 (1982) (imposing liability for negligent failure to reasonably foresee intentional, willful, or criminal acts of third persons that proximately cause injuries).

As this Court stated in *Oquendo v. Bettcher Industries,* 939 F.Supp. 357 (D.N.J.1996) (Irenas, J.), *aff'd without opinion,* 118 F.3d 1577 (3d Cir.1997), "objective foreseeability means reasonable foreseeability." *Id.* at 362. The standard "does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer." *Brown,* 484 A.2d at 1241. Rather, it "applies to those future occurrences that, in light of the general experience within the industry when the product was manufactured, objectively and reasonably could have been anticipated." *Id.; see also McDermott,* 511 A.2d at 698 (similarly requiring objective reasonable foreseeability).

Defendant contends that, because it sought to closely regulate the replacement forks authorized for use with its lift trucks, retrofitting the lift truck with nonconforming forks amounted to a substantial modification. (Def.'s Supp. Br. at 7–8). Defendant points to the "Factory Authorized Field Modification" form prepared by Raymond for the particular lift truck at issue here, which form indicates that only replacement forks conforming to a certain Raymond design were to be used. (Def.'s Reply Br. Ex. H). Defendant also includes an excerpt from its Operator's Safety Manual specifying that "[p]ursuant to Occupational Safety and Health Administration (OSHA) regulations, modifications and additions which affect capacity and safe operation shall not be performed by the customer or user without the prior written approval of The Raymond Corporation." (*Id.* at Ex. I). Defendants maintain that Andersen & Associates nevertheless outfitted the lift truck with Dyson forks which did not conform with Raymond's explicit specifications, and thus the replacement was not objectively foreseeable.

Plaintiffs counter that, because the fundamental defect was with the fork adjustment mechanism, the replacement of the forks did not materially alter the defective aspect of the lift truck's design. (Pls.' Opp. Br. at 10–11). They argue, based on *Soler,* that Defendant should be held liable unless the modification itself constituted the defect responsible for the injury. (Id. at 13 (citing *Soler,* 484 A.2d at 1231)). Moreover, Plaintiffs allege that Defendant must have been aware of the existence of after-market fork manufacturers and, as a result, it was objectively foreseeable that Raymond's customers might purchase forks manufactured by these rival suppliers.

In *Oquendo,* which involved injuries sustained by an plaintiff-employee while operating a meat press, this Court considered whether the customer-employer's removal of a point-of-operation guard from a meat press and rewiring the safety mechanism were objectively foreseeable. The Court dismissed the plaintiff's argument that the defendant manufacturer's warnings evinced objective foreseeability. The

Court also found that the ease of modification did not necessarily suggest objective foreseeability, stating that the correlation is tenuous in the industrial context and that "[p]articularly with complex manufacturing equipment, detailed expert testimony is necessary to correlate safety-defeating ease with objective foreseeability, if such correlation is indeed possible." *Id.* at 363. The Court concluded that the modification at issue there was not objectively foreseeable and granted summary judgment for the defendant.

Unlike in *Oquendo,* the general modification at issue here—replacing the forks—was objectively foreseeable. The question is whether the specific modification—use of nonconforming replacement forks—was objectively foreseeable. For instance, on the one hand, Volkswagen would not be liable if one of its customers had an accident after replacing his or her brakes with a product intended for a Toyota, even if Volkswagen was aware of aftermarket manufacturers of brake pads designed for Volkswagens. On the other hand, Volkswagen would be on thinner ice if it sought to artificially restrict the market in replacement brake pads for its products by withholding its design specifications, not licensing their use, or denying its approval of competing, yet substantially conforming, products. Or, alternately, if the brake pads, however compatible, were not the cause of the injury, but rather the braking system as a whole was responsible, Volkswagen would remain liable.

The Court need not resolve this issue, though, because, as discussed below, the non-admissibility of Plaintiff's expert report is dispositive.

## B. Admissibility of Plaintiffs' Expert Testimony

*1. Rule 702,* Daubert, *and* Kumho

In its Motion for Summary Judgment, Defendant contends that the report and testimony offered by Plaintiff's expert, Paul R. Stephens, are inadmissible under Fed.R.Evid. 702.

Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court clarified the operation and scope of Rule 702 with regard to scientific testimony. Finding that Rule 702 superseded the age-old "general acceptance" requirement announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), the Court adopted a more liberal approach which, while eschewing rigidity, nevertheless mandated scrutiny of "the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert,* 509 U.S. at 588–89, 595–96, 113 S.Ct. 2786. In so ruling, the Court highlighted the "gatekeeping role" of the trial judge. *Id.* at 597, 113 S.Ct. 2786.

As configured in the Third Circuit, *Daubert* compels a three-part analysis: (1) qualifications—whether the expert is qualified to speak with authority on the subject at issue; (2) reliability—whether the expert's methodology is sound and whether his or her opinion is supported by "good

grounds;" and (3) fit—whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir.1994) ("*Paoli II*") (citations omitted); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144–46 (3d Cir.2000).

The crux of the analysis is evaluating the "relevance and reliability" of the scientific evidence. *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* To aid in this inquiry, the Court identified several factors, *see id.* at 593–94, 113 S.Ct. 2786, upon which the Third Circuit expanded in *Paoli II*. These factors are:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II*, 35 F.3d at 742 n. 8. As the Court noted in *Daubert*, the inquiry is a flexible one. 509 U.S. at 594, 113 S.Ct. 2786.

Subsequent to the Court's decision in *Daubert*, there was significant confusion among the circuits over whether *Daubert* applied to technical experts as well as scientific ones, or whether observations based on the experts' skill or experience were admissible. *Compare, e.g., Watkins v. Telsmith, Inc.* 121 F.3d 984 (5th Cir.1997) (applying *Daubert* to non-scientific experts), *with, e.g., Compton v. Subaru of America*, 82 F.3d 1513 (10th Cir.1996) (rejecting *Daubert* and evaluating skill and experience), *cert. denied*, 519 U.S. 1042, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court granted certiorari to resolve the split.

*Kumho* involved a minivan accident precipitated by the blowout of an allegedly defective tire. The testimony at issue in *Kumho* was that of a tire expert who based his conclusions solely on a visual inspection of the tire carcass and on his experience in the industry. After the district court twice ruled to exclude the testimony, the Eleventh Circuit reversed, finding that the testimony fell outside the scope of *Daubert*.

Reversing the circuit, the Supreme Court held that *Daubert* applied not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *Kumho*, 526 U.S. at 141, 119 S.Ct. 1167. The Court further held that "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id.* The Court emphasized that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167

That guidance notwithstanding, in the wake of *Kumho*, courts have nevertheless struggled, with varying degrees of success, to apply the *Daubert* factors to seemingly recalcitrant technical subjects such as engineering. *Compare Carbotrade, S.p.A. v. Veritas*, No. 92 CIV. 1459 JGK, 1999 WL 714126 (S.D.N.Y. Sept. 14, 1999) (thoroughly analyzing expert's measurements and calculations and concluding that meth-

odology was not supported by scientific literature in case involving a cargo ship which broke in half and sunk), *with Smith v. Borden, Inc.,* 188 F.R.D. 257 (M.D.La. 1999) (rejecting "peer review" and "rate" of "error" *Daubert* factors but applying "testing" and "generally accepted" factors in case involving aerosol can fire), *and with Peitzmeier v. Hennessy Indus., Inc.* 97 F.3d 293 (8th Cir.1996) (pre-*Kumho* case utilizing overly formal application of *Daubert*). This struggle has been accompanied by a chorus of scholarly criticism. *See generally, e.g.,* Sara K. Ledford, Note, *The Implications of* Kumho Tire: *Applying* Daubert *Analysis to Warning Label Testimony in Products Liability Cases,* 76 Ind. L.J. 465 (2001) (discussing inapplicability of *Daubert* factors to social science research); Kimberly M. Hrabosky, Note, Kumho Tire v. Carmichael: *Stretching* Daubert *Beyond Recognition,* 8 Geo. Mason L.Rev. 203 (1999) (arguing that "mechanical application of *Daubert* to nonscientific expert testimony defies logic and could lead to substantial injustice in the criminal context"); *cf.* Erica Beecher-Monas, *The Heuristics of Intellectual Due Process: A Primer for Triers of Science,* 75 N.Y.U. L.Rev. 1563, 1566–68 (2000) (arguing that judges gloss over genuine scientific inquiry due to perplexity over required inquiry).

Unlike laboratory or medical testing, which employ rigorous and replicable protocols, technical fields such as engineering often involve more idiosyncratic methods of design and testing. That said, these fields nevertheless rely on established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices. As the Fifth Circuit stated in *Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir.1997),

"alternative designs by definition include elements of science, technology, and methodology." *Id.* at 991.

Furthermore, despite the criticism, *Kumho*'s application of *Daubert* to such fields is supported by valid policy rationales. The objective of *Daubert*'s gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. As Justice Scalia once wryly observed, "interior decorating is a rock-hard science compared to psychology practiced by amateurs." *Lee v. Weisman,* 505 U.S. 577, 636, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting). Accordingly, "it seems exactly backwards that experts who purport to rely on general engineering principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique. The moral of this approach would be, the less factual support for an expert's opinion, the better." *Watkins,* 121 F.3d at 991.

### 2. Indicia of Reliability

■ To ensure that courts do not neglect their "gatekeeping" duties with regard to nonscientific testimony, it is necessary to reconfigure *Daubert* for application to such testimony. After reviewing cases nationwide, this Court has identified several components of expert testimony which courts have looked to as indicia of reliability.[2] While these factors were culled primarily from products liability cases, they may have applicability beyond that field. At the same time, this list is not exhaustive

---

**2.** The Court reviewed both post-*Kumho* cases as well as pre-*Kumho* cases applying *Daubert.*

and may have limited relevancy to certain types of testimony.

1. Federal Design and Performance Standards—At the outset, courts scrutinizing expert testimony should look to see if the expert has identified and discussed any relevant federal design or performance standards,[3] such as those promulgated by the Occupational Safety and Health Administration (OSHA) or the National Highway Traffic Safety Administration (NHTSA). Not only do these regulations have independent legal significance, but they also represent important parameters for industrial design.

2. Independent Standards Organizations—Courts should also examine whether the expert has referenced standards published by independent standards organizations such as the American National Standards Institute (ANSI), Underwriters' Laboratories (UL), the American Society of Mechanical Engineers (ASME), and the American Society for Testing and Materials (ASTM). While lacking the legal authority of federal regulations, they provide detailed design standards which reflect systematic testing and safety certification. See Bourelle v. Crown Equip. Corp., 220 F.3d 532, 537 (7th Cir.2000) (finding that expert's failure to submit alternative design theories to ANSI was factor supporting exclusion of his testimony); Stanczyk v. Black & Decker, Inc., 836 F.Supp. 565, 567 (N.D.Ill.1993) (finding that miter saw guard's compliance with UL standards helped undermine expert testimony alleging design defect).

3. Relevant Literature—Courts should determine whether an expert has supported his conclusions through discussion of the relevant literature, broadly defined. This component could be satisfied by general design manuals or industry-specific journals. The Court recognizes that not every field or area of industrial design has a related trade publication. Relevant articles may address general design guidelines or rules of thumb, industry practice, developments in industrial design, testing protocols, and design standards for the particular type of product. Surveying relevant literature is one aspect of Daubert's peer review prong.

4. Industry Practice—Another important indicia of reliability is industry practice—whether other manufacturers and consumers in the industry utilize the allegedly defective design or the proposed alternative. Industry practice may be used as a proxy for peer review. Stanczyk, 836 F.Supp. at 567. In alternative design cases, evidence of industry practice may help negate criticism based on lack of testing. McPike v. Corghi, S.P.A., 87 F.Supp.2d 890, 893–94 (E.D.Ark.1999). Conversely, the absence of industry practice—or the expert's failure to include such evidence—may undermine the proposed alternative. Bourelle, 220 F.3d at 532 (finding that absence of evidence of industry practice made expert opinion unreliable); Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1084 (8th Cir.1999) (stating that expert failed to identify any manufacturer that incorporated his proposed safety feature into similar machinery).

An expert may gather this information through a patent search or through his experience and knowledge of the industry. See Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir.1995). Regardless, if the

---

**3.** Design standards address the shape or form of an item or whether a certain feature must be included. Performance standards address what that item or feature must accomplish. For instance, a requirement that every car have headlights is a design standard; a requirement that those headlights be of a certain intensity is a performance standard. See DePaepe v. General Motors Corp., 141 F.3d 715, 718 (7th Cir.1998).

expert seeks to base his conclusions on the existence of products incorporating his proposed alternative, he must corroborate his assertions by identifying these products, their manufacturers, and the extent of their use, and discussing the allegedly defective design in this context. For instance, in *Oddi*, the expert testified that he had "studied" other bread trucks, but could not recall whether they were the same kind of truck involved in the litigation. 234 F.3d at 156.

> Q. You didn't make a note of what the bread truck was so you could go back and say, "Here's the design I'm proposing and somebody is already using this."
>
> A. I said that in my mind, and I had groceries and I didn't have a camera and nothing else.
>
> Q. You don't remember the name of the bread company?
>
> A. No, I don't. It might come to me. I can't tell you, no.

*Id.* at 156–57. The Third Circuit affirmed the trial court's exclusion of the testimony.

In *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175 (E.D.N.Y.2001), the court excluded an expert's testimony when, after the expert identified another manufacturer's product as a preferable alternative, his deposition revealed that he had never seen the rival product and did not know how it worked. *Id.* at 183. In *Watkins*, the expert testified that he had "seen" product features similar to those he proposed. 121 F.3d at 992. When asked about his investigation, he stated that he had "looked around." *Id.* Nevertheless, the expert failed to identify the manufacturers of any such products. The appeals court affirmed the judge's exclusion of the expert's testimony, concluding that "[w]here an expert bases his opinions in part on his experience with similar machines, we cannot fault the court for demanding a more detailed recollection of the expert's review

and understanding of similar machines than was reported by [this expert]." *Id.*

5. Product Design and Accident History—Courts have also relied on product or design history—or the absence of it—in evaluating the reliability of an expert's testimony. Such history may focus on the design development of a type of a product, or on one specific product in particular. For instance, in *Saad v. Shimano American Corp.*, No. 98 C 1204, 2000 WL 1036253 (N.D.Ill. July 24, 2000), the defendant's expert reviewed the product history of clipless pedals and of the Shimano system at issue in the accident. *Id.* at *5. The expert's testimony may also address accident experience with the allegedly defective product. *See Bourelle*, 220 F.3d at 538 (excluding testimony based in part of failure to cite accident experience studies).

6. Charts and Diagrams—Courts have also looked to whether an expert has provided charts, diagrams, and other visual aids to explain his conclusions and to assist the potential trier of fact in understanding his testimony. Especially in alternative design cases, in which the proposed alternative is often not yet manufactured, diagrams force the expert to actualize his theory with a degree of specificity, and serve a valuable illustrative role for the court, or potentially for a jury. *See Bourelle*, 220 F.3d at 537 (finding that expert's failure to prepare drawings of alternative design was appropriate factor to consider in excluding testimony); *Jaurequi*, 173 F.3d at 1084 ("[the expert] has not attempted to construct or even draw the suggested device, much less test its utility ..."); *Watkins*, 121 F.3d at 992 ("[The expert] did not even make any drawings or perform any calculations that would allow a trier of fact to infer that his theory that the conveyor design was defective and that alternative designs would have prevented the accident without sacrificing utility were

supported by valid engineering principles.")

7. Scientific Testing—Both *Daubert* and *Kumho* properly emphasize the centrality of scientific testing and the court's scrutiny of the soundness of that testing. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 ("[A] key question to be answered ... will be whether [a theory or technique] can be (and has been) tested."); *Kumho*, 526 U.S. at 149–50, 119 S.Ct. 1167. This testing may involve only the allegedly defective design, or, in alternative design cases, could address the proposed alternative as well. Regardless, testing applies scientific or technical principles to the subject at issue. Before a court can evaluate the reliability of an expert's methodology, the expert must employ one.

For instance, in a case alleging a design defect in clipless bicycle pedals, the defendant's expert measured the force necessary to achieve pedal release in a variety of directions, in conformance with ASTM testing standards. *See Saad*, 2000 WL 1036253, at *5; *see also Lichter v. Case Corp.*, No. 99 C 4260, 2001 WL 290615 (N.D.Ill. March 20, 2001) (finding that kinematic and force analysis is "standard engineering procedure" and therefore product of reliable principles and methods). Correspondingly, the absence of testing is a consistent factor in court decisions excluding expert testimony. *See, e.g., Jaurequi*, 173 F.3d at 1084 (finding expert's failure to test utility of proposed alternative design was permissible reason for district court to exclude testimony); *Bourelle*, 220 F.3d at 538 (same); *Peitzmeier*, 97 F.3d at 297 (same). Particularly in alternative design cases, merely conceptualizing possibilities is not alone sufficient. Testing of the proposed alternative is often required. *See Watkins*, 121 F.3d at 992; *Stanczyk*, 836 F.Supp. at 567 ("[T]he history of engineering and science is filled with finely conceived ideas that are unworkable in practice."); *see also Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir.1996) ("Our cases have recognized the importance of testing in alternative design cases.").

8. Feasibility of Suggested Modification—In alternative design cases, one of most important aspects of an expert's testimony is whether the proposed alternative design or modification is feasible and/or compatible with the underlying design. This may involve computer analyses and calculations and likely involves testing of the proposed modification. For instance, in *Padillas v. Stork–Gamco, Inc.*, No. 95–7090, 2000 WL 1470210 (E.D.Pa. Oct. 2, 2000), the court excluded part of the expert's testimony because he "offered scant testimony concerning an engineering methodology on the issue of how to design, fabricate or install a guard that would make a machine safe but not interfere with the operation of the machine." *Id.* at * 3. In *Watkins*, the circuit court faulted the expert for failing to make any diagrams or calculations to demonstrate that the alternative design "would have prevented the accident without sacrificing utility." 121 F.3d at 992. The court concluded, "Perhaps a design defect case can be mounted without calculations to support an expert's theories, but the district court did not err in concluding that some calculations were necessary to demonstrate the feasibility of [his] ideas." *Id.* And in *Jaurequi*, the court affirmed the exclusion of expert testimony where the expert failed to test the utility of the suggested design as a safety device or its compatibility with machine's proper function. 173 F.3d at 1084; *see also Bourelle*, 220 F.3d at 536 (noting expert's failure to test feasibility); *Peitzmeier*, 97 F.3d at 297 (finding no factual basis for assertions of feasibility); *Pestel*, 64 F.3d at 384 (noting failure to determine feasibility).

9. Risk–Utility of Suggested Modification—Related to the feasibility issue, and just as important, is the risk-utility of the suggested modification. Even if a modification is feasible, the expert must address whether that modification will so affect the operation of the device that it makes it ineffective for its intended purpose. As the Seventh Circuit held in *Cummins:*

> There are a number of considerations which must inform such a conclusion. These include, but are not limited to, the degree to which the alternative design is compatible with existing systems and circuits; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative design; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine.

93 F.3d at 369. As the court further noted, "many of these considerations are product- and manufacturer-specific, and most cannot be determined reliably without testing." *Id.* Without this type of analysis, courts are hard-pressed to find reliable an expert's conclusions regarding the defectiveness of the product and the appropriateness of the proposed alternative design.

Thus, to recapitulate, among the indicia of reliability that courts may consider in evaluating expert testimony under Rule 702 are the following: 1) federal design and performance standards; 2) standards established by independent standards organizations; 3) relevant literature; 4) evidence of industry practice; 5) product de-

sign and accident history; 6) illustrative charts and diagrams; 7) data from scientific testing; 8) the feasibility of suggested modification; and 9) the risk-utility of suggested modification.

### 3. Summary Judgment

The Third Circuit has recently considered the circumstances under which summary judgment is appropriate when based on the exclusion of expert testimony. In *Oddi,* the circuit court held that the expert's failure to conduct any scientific testing and his reliance on his own intuition were proper considerations in excluding the expert's report. 234 F.3d at 158. The court distinguished a prior Third Circuit decision, *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3d Cir.1999), in which the circuit reversed the district court's exclusion and ordered further proceedings. In *Padillas,* the circuit found that "[t]he district court's analysis of the [report] does not establish that [the expert] may not have 'good grounds' for his opinions, but rather, that they are insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explained." *Id.* at 418 (internal citations omitted).

In contrast, in *Oddi,* the court did not find the expert's report conclusory or confusing but rather that his conclusions were not supported by scientific methods and procedures or by the record.[4] 234 F.3d at 158. The court stated that, "[a]lthough *Daubert* does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry that [the expert] engaged in." *Id.*

---

4. The court noted that another consideration in *Padillas* was the fact that, because the expert prepared his report prior to the Supreme Court's decision in *Kumho,* " 'plaintiff could not have known in advance the di-

rection the district court's opinion might take and thus needed an opportunity to be heard on the critical issues before having his case dismissed.' " *Oddi,* 234 F.3d at 153 (quoting *Padillas,* 186 F.3d at 417).

at 156. Moreover, the court held, "*Padillas* certainly does not establish that a District Court must provide a plaintiff with an open-ended and never-ending opportunity to meet a *Daubert* challenge until plaintiff 'gets it right.'" *Id.* at 154 (quoting *In re TMI Litig.*, 199 F.3d 158, 159 (3d Cir. 2000)).

### 4. Stephens's Testimony

■ In connection with this litigation, Plaintiffs' expert, Paul R. Stephens, submitted an expert report and was deposed by Defendant's counsel. The report begins by listing various documents, manuals, articles, and design standards that Stephens claims to have reviewed in preparing his report. (Pls.' Opp. Br. Ex. B at 1–3). Stephens also inspected the lift truck involved in the accident and observed GM staff operate the lift truck. (*Id.* at 3, 7). Based on his review and observations, Stephens' diagnosis was that:

> [1.] Raymond's fork mounting design creates an incentive for operators to utilize an unsafe procedure to adjust the forks. It is an inherently hazardous procedure to adjust the forks on a lift truck utilizing such a fork mount design because of the risk that personnel either will inadvertently or intentionally position their hands between the fork and carriage when the fork has been lifted away from the carriage.... [2.] Raymond's reach truck product, lacking a power-operated fork positioning feature, was defective.... [3.] The design defect in Raymond's reach truck was a proximate cause of Mr. Milanowicz' incident.... [4.] It was technically and economically feasible to eliminate the hazard at the time the incident lift truck was manufactured in 1991.

(*Id.* at 7–8). Stephens's deposition testimony substantially echoed these views.

### 5. Daubert *Analysis*

As discussed, the thrust of the *Daubert* is evaluating the reliability of the expert's testimony. The Court must focus, not on the expert's conclusions, but rather on whether his methodology was sound and whether he had "good grounds" for his conclusions. Having reconfigured *Daubert* for application to technical fields, the Court now reviews Stephens' testimony in light of the indicia of reliability that the Court has identified.

First, it is necessary to address briefly Plaintiffs' effort to rebut this analysis, in which they argue that "the factors enumerated in *Daubert* are not 'reasonable measures of the reliability of the expert testimony'" and that, as a result, Defendant's reliance on Daubert and Kumho is "misplaced and wholly distinguishable from the instant case." (Pls.' Opp. Br. at 17, 19). Instead, Plaintiffs rely on *Poust v. Huntleigh Healthcare*, 998 F.Supp. 478 (D.N.J.1998), a pre-*Kumho* case admitting expert testimony based on the expert's experience and training. Plaintiffs fail to recognize, however, that *Kumho* squarely overruled *Poust.* In fact, *Poust* prominently cites the Eleventh Circuit's opinion in *Carmichael v. Samyang Tire*, Inc., 131 F.3d 1433 (11th Cir.1997), that was reversed by the Supreme Court in *Kumho.*

Proceeding to the analysis, the Court finds that, while Stephens lists a number of design standards at the beginning of his report, he does not specifically reference any of them in the body of his report. His deposition reveals that Stephens conceded that he has no reason to believe that the Raymond Model 40 lift truck at issue in this case did not comply with ANSI Standard B56.1, the safety standard for low lift and high lift trucks. (Def.'s Supp. Br. Ex. C at 169–171). More specifically, Stephens testified that the ANSI standard did not require the powered fork positioners

that he maintains should be required. (*Id.* at 173). Further, Stephens could not identify any industry standard requiring powered fork positioners as standard equipment, (*Id.* at 180), nor could he identify any professional organization or consumer group which had take the position that Raymond Model 40 lift trucks or similar lift trucks should be outfitted with powered fork positioners as standard equipment. (*Id.* at 227–28). Finally, Stephens acknowledged that the relevant OSHA standards incorporate the ANSI standard, and, as a result, the Raymond lift truck, as designed, complied with federal regulations. (*Id.* at 174).

Stephens also did not find adequate support for his conclusions in the relevant literature. While he claims to have reviewed a number of manuals and articles, the only citations he provides in his report are for the rather uncontroversial propositions that the elimination of identifiable, foreseeable hazards is a fundamental concern in industrial design and that users be warned of those hazards which have not been eliminated. (Pls.' Opp. Br. Ex. B at 7–8). As he testified at his deposition, he used these references as the "foundation" for his report. (Def.'s Supp. Br. at 235). However, he conceded that he never seen a technical publication or any other document which criticized lift trucks such as the Raymond Model 40 for not utilizing powered fork positioners or which argued that powered fork positioners were a necessary safety feature. (*Id.* at 234–35). Moreover, he testified that he had never seen an article, product report, or advertisement in a trade publication regarding lift trucks sold with powered fork positioners, though he did state that he had seen an advertisement for powered fork positioner as an attachment. (*Id.* at 184). In short, beyond general design principles, Stephens identified nothing in the literature which would suggest peer review of his conclusions.

■ The central contention of Stephens's report, and thus of Plaintiff's case, is that, because powered fork positioners were available and widely used in 1991, Raymond should have incorporated this device into its Model 40 lift truck. (Pls.'s Opp. Br. Ex. B. at 8; Opp. Br. at 18). Leaving aside Plaintiffs' mistaken contention that an expert's experience is sufficient to satisfy Rule 702, Stephens fails to adequately substantiate his contentions that powered fork positioners were available and widely used in 1991.

Q. To your knowledge, does the Raymond Corporation design and manufacture a powered fork positioner?

A. (Pause.) Near as I recall from Mr. Rogers' deposition, they did not. I don't know today.

Q. Would you agree then if they did not so design or manufacture a product, they would have to go out and get one on the open marketplace to supply for a truck like the model 40?

A. Yes.

Q. Are you aware of the existence of one or more manufacturers of powered fork positioners in the country or the world?

A. Yes.

Q. More than one?

A. I think so.

Q. To you knowledge, are there different sizes, shapes, weights, and configurations of powered fork positioners that are available in the marketplace?

A. Sure.

Q. Are you prepared to identify for me the single type, model, design, configuration, size, weight, powered fork positioner you contend the Raymond Corporation should have put on its Raymond

model 40 forklifts as standard equipment?

A. No.

Q. Why not?

A. Didn't think it was necessary. It's a feasible thing. I didn't think it was necessary to go into the details.

.    .    .    .    .

Q. You're not prepared to select which one or ones are available in the open marketplace or were available in the marketplace in 1991 when the subject Raymond model 40 was produced that would satisfy your engineering muster or your engineering test?

A. At this point, no. There is just no need. There was no question that it was feasible.

Q. Is there a single powered fork positioner that you can identify for me today that was available in 1991, which if installed on the Raymond model 40 forklift, you would say that truck is no longer defective in design?

A. Not a specific model, no.

Q. How about a manufacturer?

A. No.

(Pl.'s Supp. Br. Ex. C at 228–29, 231–32). As the Court noted earlier, if an expert seeks to base his conclusions on the existence of products incorporating his proposed alternative, he must corroborate his assertions by identifying these products, their manufacturers, and the extent of their use. *See Oddi*, 234 F.3d at 156–57; *Watkins*, 121 F.3d at 992. Stephens provides nothing other than his assurances. Moreover, he undermines the implicit argument that Raymond should have known in 1991 that powered fork positioners were necessary safety equipment by stating that "[a] fork positioner is often viewed more as adding versatility to the machine and not viewed as a safety feature." (Def.'s Supp. Br. Ex. C at 233).

Stephens also did not perform any substantive testing of either the allegedly defective design or of his proposed alternative in connection with this litigation. Nor did he produce any diagrams or perform any calculations which would illustrate his claims. While Stephens inspected and observed the operation of the subject Raymond lift truck, which is outfitted with the replacement Dyson forks, he conceded that he was not aware of ever having seen or personally tested a Raymond lift truck with Raymond-specified forks. (*Id.* at 71). Moreover, he never did any testing to determine the relative misindexing performance of cylindrical pins versus chamfered pins, either in new or used states. (*Id.* at 117–19). Nor did he ever test the relative force required to lift an original 48–inch fork versus the replacement 60–inch fork nor the capacity of powered fork positioners to deal with these different length (and weight) forks. (*Id.* at 231). While the Court understands that Stephens' contention is that the manual readjustment mechanism was defective, it is hard to believe that he did not do any testing to compare the performance of the replacement Dyson forks with that of the original Raymond-specified forks. "Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is, the process of eliminating other possible diagnoses." *Rutigliano v. Valley Bus. Forms*, 929 F.Supp. 779, 786 (D.N.J.1996), *aff'd without opinion*, 118 F.3d 1577 (3d Cir.1997); *see also Oddi*, 234 F.3d at 157 (discussing failure to consider alternative causation); *Diaz v. Johnson Matthey*, 893 F.Supp. 358, 377 (D.N.J.1995) (excluding testimony because expert inadequately supported allegation of specific causation).

Stephens also did not indicate in his report any investigation of the design history of the Raymond Model 40 lift truck or of the manual adjustment system used or of the powered fork positioners he recommends. He testified that, prior to his consulting career (which began in 1989, two years before the lift truck at issue here was manufactured), he had never operated a lift truck with powered fork positioners. (Pls.'s Opp. Br. Ex. C at 141–42). It is unclear whether he subsequently operated such a lift truck. In order words, he provided no historical context for his contentions. Additionally, besides quoting Plaintiff as saying that there had been other accidents "with those particular forks" at the GM plant, Stephens did not make an effort to determine whether, or to what extent, there have ever been similar accidents with Raymond Model 40 lift trucks or any other similarly designed vehicles.

Stephens also proffers without support his contention that fitting a Raymond Model 40 lift truck with powered fork positioners was feasible. In his report, he states, "The lift truck's design feature mechanical components moved by hydraulic cylinders. It was technically feasible to utilize the same type of technology to provide a power-operated, fork positioning feature on the truck. . . ." (Pls.' Opp. Br. Ex. B. at 8). However, Stephens does not discuss how the technology worked or how it would be integrated with the lift truck. As he explained when asked why he could not identify any model or manufacturer, "[i]t's a feasible thing. I didn't think it was necessary to go into the details." (Def.'s Supp. Br. Ex. C at 229). Again, the Court is left with little more than Stephens's assurances.

Stephens does not provide any more support for the notion that his proposed design would not adversely impact the util-

ity of the lift truck at issue. While he does note in his report his belief that incorporating powered fork positioners would have raised the cost of the Raymond Model 40 lift truck by no more than five percent, (Pls.' Opp. Br. Ex. B. at 8 n. 5), he does not address at all the effect of the addition on the lift truck's operation. While admitting that the device increases the size of the truck and decreases the load capacity ("in order to be able to maintain a stable machine"), Stephens did not investigate what GM's load capacity requirements were or whether fitting a Raymond Model 40 lift truck with a powered fork positioner would reduce the unit's load capacity below those requirements. (Def.'s Supp. Br. Ex. C at 237–38). Moreover, Stephens even conceded that, in his alternative design, the forks would still need to be able to swivel at times— "[t]hat's absolutely essential"—and that an individual could still slip his hand behind the fork. (*Id.* at 251–54).

Summing up, Stephens' testimony fails to comport with every indicia of reliability that the Court has identified. This is not a situation, as in *Padillas,* in which the expert's findings are confusing. Moreover, unlike the expert in *Padillas,* Stephens, who is a paid engineering consultant and who prepared his report after *Kumho* was decided, cannot plead ignorance of the *Daubert* standards, Plaintiffs' counsel's legal error notwithstanding. As in *Oddi,* Plaintiffs had ample opportunity to develop the record here. Unfortunately, Stephens's testimony employed no defined methodology and did not provide "good grounds" for his conclusions. He did not even elaborate on his brief mention of general design principles, the alleged "foundation" of his report. And, as addressed extensively above, he provided no evidence of the availability or extent of use of his proposed alternative design, let alone identify a single model or manufac-

turer. As the Supreme Court stated in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 146, 118 S.Ct. 512. Nor is a district court obligated "to provide a plaintiff with an open-ended and never-ending opportunity to meet a *Daubert* challenge until plaintiff 'gets it right.'" *Oddi*, 234 F.3d at 154 (citations omitted).

While Stephens appears to have adequate qualifications, it is not necessary for the Court to more closely scrutinize them in light of the lack of reliability of his testimony. For the same reason, it also unnecessary to consider its "fit."

### 6. *Failure to Warn and Inadequate Instructions*

■ Stephens maintains in his report that the operating manual for the Raymond Model 40 lift truck should have contained instructions and a depiction of the safe procedure for manually adjusting the forks and that there should have been a durable warning on the carriage of the lift truck. The Court must evaluate this testimony under the same indicia of reliability as laid out above. *See Bourelle*, 220 F.3d at 538.

In terms of federal and industry standards and the relevant literature, Stephens cites a few design manuals and references, as well as the ANSI standard. (Pls.' Opp. Br. Ex. B. at 8). However, Stephens does not discuss what these sources say nor how they informed his analysis. Nor does he attach the relevant excerpts as exhibits.

■ Stephens also has not written a proposed alternative warning or set of instructions which would have met his standards.

Q. What in summary is that opinion?

A. Basically that there should have been instructions in the manual and on the machine as to how to safely adjust the fork spread. There were none.

Q. Have you designed what the instructions should be that you're critical of?

A. No.

Q. Have you designed a warning that includes a warning which would pass the Stephens design?

A. Not to date, but I could.

Q. Have you been asked by counsel to craft either instructions or warnings language.

A. No.

(Def.'s Supp. Br. Ex. C at 254–55). Nor has Stephens tested the effectiveness of any proposed instructions or warnings.

Q. Have you performed any type of testing upon operators or focus groups to see whether or not the warnings which you have conceptualized would actually convey sufficient and appropriate information to people to do the fork adjustment procedure at issue here?

A. No.

(*Id.* at 256). Likewise, Stephens testified that he was not aware of any other manufacturer of similar equipment which used instructions or warnings that he claimed were lacking on the Raymond Model 40. (*Id.* at 255). As the court held in *Jaurequi*, an expert's failure to design and test a proposed warning and inability to point to contrary industry practice renders the reliability of his testimony "extremely questionable." 173 F.3d at 1084.

Because Stephens's testimony falls short of the reliability standards of Rule 702, this Court will exclude it. As Plaintiffs have put forward no other evidence to support their design defect and failure to

warn claims, the Court concludes that summary judgment is appropriate. *See Reiff v. Convergent Techs.*, 957 F.Supp. 573, 580–81 (D.N.J.1997); *see also Ridenour v. Bat Em Out*, 309 N.J.Super. 634, 707 A.2d 1093, 1097 (1998). Because Plaintiffs cannot establish Defendant's liability, Plaintiff Lynne Milanowicz's consortium claim is also dismissed.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted. The Court will enter an appropriate order.