**Albert W. EBENHOECH and Gail Ebenhoech, h/w, Plaintiffs,**

v.

**KOPPERS INDUSTRIES, INC., et al., Defendants.**

**Civil No. 00–5641(JBS).**

United States District Court, D. New Jersey.

Dec. 24, 2002.

---

**3.** Unger is advised to clarify the extent of her alleged insurable interest in future court filings.

Gary F. Piserchia, Esquire, Parker, McCay & Criscuolo, P.A., Marlton, NJ, for Plaintiffs.

Stuart M. Goldstein, Esquire, Hollstein, Keating, Cattell, Johnson & Goldstein, P.C. Marlton, NJ, for Defendants.

**OPINION**

SIMANDLE, District Judge.

This Court is presently called upon to decide, among other issues, an issue of first impression, namely whether an action may lie in New Jersey products liability law when a tank car used to transport a hazardous chemical has some of the hazardous chemical on its exterior and causes injury to an employee of the consumer of the chemical. For the reasons that follow, this Court finds that a plaintiff injured by the chemical spill may allege that the tank car, with the spill on its exterior, suffers from a manufacturing defect.

This Court will also decide the issues presented in the following motions: (1) plaintiffs' motion to bar testimony of, or admission into evidence of, various incident reports of plaintiff's employer and testimony or evidence of the amount of plaintiff's lump sum retirement payment, (2) defendant's motion to strike plaintiffs' products liability claim, (3) defendant's motion to dismiss plaintiffs' cause of action and damage claim, (4) defendant's motion to strike plaintiffs' claim of future wage loss and preclude evidence thereof, (5) defendant's motion to admit evidence regarding plaintiff's conduct at trial, (6) defendant's motion to preclude opinions of plaintiffs' expert, and (7) defendant's motion to deem its requests for admissions be admitted. Several aspects of these motions have been resolved.[1]

---

1. The parties have agreed to the resolution of two of the motions and to a partial resolution of a third. First, at oral argument on November 15, 2002, the parties agreed the seventh motion, defendant's motion to deem its requests for admissions be admitted should be dismissed as moot because it was resolved by the Joint Final Pretrial Order. Second, in a letter dated November 19, 2002, plaintiff notified the Court that it was withdrawing its future wage loss claim so that the fourth motion, defendant's motion to strike plaintiffs' claim of future wage loss and preclude evidence thereof should be dismissed as moot. Third, defendant agreed at oral argument that it would not seek admission of any evidence about the amount of plaintiff's lump sum retirement payment if plaintiff withdrew the

The Court thus needs to decide the issues presented in five motions: (1) plaintiffs' motion to bar admission into evidence of Solutia's unusual incident report, (2) defendant's motion to preclude opinions of plaintiffs' expert, (3) defendant's motion to admit evidence regarding plaintiff's conduct at trial, (4) defendant's motion to dismiss plaintiffs' cause of action and damage claim, and (5) defendant's motion to strike plaintiffs' products liability claim.

This Court will first consider the evidentiary motions and will grant plaintiff's motion by finding the unusual incident report is inadmissible, will grant defendant's motion to preclude the strict liability opinion of plaintiff's expert, and will grant defendant's motion to admit conduct evidence subject to restrictions on the use of the evidence. Then the Court will consider the two motions relating to plaintiff's causes of action and will deny the negligence motion and will deny in part the products liability motion, so that the negligence claim and manufacturing defect products liability claim will proceed to trial.

## I. BACKGROUND[2]

On November 2, 1998, plaintiff Albert Ebenhoech, as chief chemical operator at Solutia, Inc., slipped and fell about fifteen feet off the side of a tank car and severely injured his left leg. Plaintiff alleges that defendant Koppers Industries should be liable under a negligence or products liability theory for spilling a hazardous chemical called phthalic anhydride on the rail car and for not cleaning it off prior to shipping the car to Solutia. Phthalic anhydride ("PAA") is a liquid chemical that solidifies in ambient conditions and can cause thermal burns, allergic respiratory reactions, and eye and skin burns. When solidified, PAA appears as a white crystalline substance.

On November 2, 1998, plaintiff was asked to decontaminate a tank car that had arrived at Solutia's facilities about one week prior. The tank car was leased to Solutia by defendant Koppers for use in transporting the PAA. Plaintiff says that when he observed the PAA crystalized on the sides of the rail car when it arrived at Solutia, he was aware that he would need to clean the spill. Plaintiff was assisted in the clean-up operation by another worker, Ed Tokley.

Solutia's PAA cleaning process included two steps. First, a large plastic drum with two holes in the bottom was positioned either on a flat domed platform or directly on top of the rail car to be cleaned. Next, soda ash was mixed with warm water from a hose inside the drum. As the solution mixed, it would flow out of the bottom drum holes and over the PAA on the sides of the rail car and would break up the solidified PAA. The PAA would then fall off the side of the rail car and into a catch pan.

At the time of plaintiff's accident, plaintiff says he was on the top of the tank car

---

future wage loss claim. Therefore, because plaintiffs withdrew the future wage loss claim, the first motion to bar admission of incident reports and plaintiff's retirement payment should be dismissed in part as moot. Plaintiffs also agreed to withdraw their motion to bar admission of two reports disputed in the first motion—Solutia's November 3, 1998 "employer's first report of accidental injury or occupational illness" and Solutia's November 3, 1998 web-based injury report—

as long as they were redacted to eliminate reference to worker's compensation. The reports will be suitably redacted and, as a result, the first motion will be dismissed in part as moot as it pertains to the two November 3, 1998 reports.

**2.** This background of the case is taken from this Court's summary judgment opinion filed January 16, 2002.

with the drum in the area where the PAA had spilled, which was outside the protected domed platform area. Plaintiff, handling the hose that was supplying the warm water, slipped and fell as he walked across the top of the rail car toward the platform area. He acknowledged that "personal fall protection" was available at Solutia for certain jobs, but he did not use such equipment during the clean up. Instead, he wore only a hard hat, gloves, work shoes, and safety glasses. Plaintiff also testified that he never wore fall equipment when he had performed similar rail car cleanings in the past.

On October 4, 2000, plaintiff filed this action in New Jersey Superior Court, Camden County. On November 16, 2000, defendant removed the case to this Court, citing diversity jurisdiction. On July 6, 2001, defendant filed a motion for summary judgment which was denied by this Court on January 16, 2002. [Docket Items 11–1.] Since then, the parties have filed the seven motions in limine at issue here.

## II. DISCUSSION

### A. Standard of Review

 This Court may hear the present motions in limine because it has the inherent authority to manage cases brought be-

fore it.[3] *Luce v. United States,* 469 U.S. 38, 40 n. 2, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). An "in limine ruling on evidence issues is a procedure which should, in the trial court's discretion, be used in appropriate cases." *In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). One such appropriate case is where the court can shield the jury from unfairly prejudicial or irrelevant evidence. *See United States v. Romano,* 849 F.2d 812, 815 (3d Cir.1988). The in limine motion then fosters efficiency for the court and for counsel by preventing needless argument at trial. *New Jersey Civil Procedure* § 16–2:2 (citing *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069 (3d Cir.1990)). However, the ruling should not be made prematurely if the context of trial would provide clarity. *Japanese Elec.,* 723 F.2d at 260.

### B. Analysis

#### 1. Plaintiff's motion to bar admission of Solutia's "Unusual Incident Report"

 In this motion, plaintiffs seek to exclude an unusual incident report created

3. This Court notes that two of the motions in limine seek to strike plaintiffs' causes of action and are, in effect, summary judgment motions. This Court inquired about the filing of the motions at oral argument on November 15, 2002. The parties agreed that the Court should treat the motions as summary judgment motions, especially because the parties were not sure until October 1, 2002 that this action included a products liability cause of action. (10/1/02 Mem. Opinion and Order).

Therefore, this Court will consider the motions pursuant to the summary judgment standard. Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

by plaintiff's employer after the accident. Plaintiffs argue that the Solutia report should be excluded because it is not relevant[4] since it deals with Solutia's actions and not Koppers, and because it is hearsay.[5] (Pls.' Br. at 3–6.) Defendant argues that it is relevant to the issue of fault and that it is admissible under either the records of regularly conducted activity exception, Fed.R.Evid. 803(6), or the statement against interest exception, Fed.R.Evid. 804(b)(3), to the hearsay rule. (Def.'s Br. at 2–8.) This Court finds that the report is relevant, but is inadmissible hearsay.

The report is relevant evidence of the accident's occurrence and cause. It describes the chronology of the incident and determines that its primary cause was the "at-risk behavior of working at an elevated location without fall protection." (Pls.' Br., Ex. C.) The report includes observations that form the basis for the conclusion, such as plaintiff's lack of personal fall protection, Solutia's improper facilities for cleaning PAA, and the soda ash solution's "extremely" slippery nature when used on smooth tank cars. (Id. at 2.) The report also includes information directly relevant to defendant Koppers' liability. On page one of the report, the description of the

accident begins with a statement that "Koppers phthalic anhydride car GATX 31772 had been received on 10/23 with spilled/solidified material on top and down the sides of the car." (Id. at 1.) The report is therefore clearly relevant not just to the accident's cause, but also to the issue of when and how the PAA appeared on the exterior of the tank car.

 However, while the report is relevant, this Court finds that it is not admissible. Defendant admits that it is hearsay, but argues that the regularly conducted activity exception and the statement against interest exception to the hearsay rule allow the admission of the report. This Court finds that neither exception applies.[6]

The report does not fit within the exception for reports of regularly conducted activities which allows admission if:

the witness who lays the foundation for the admission of evidence testif[ies]: (1) that the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded the statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the busi-

---

4. Fed.R.Evid. 402 provides:

 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

5. Hearsay is defined by Fed.R.Evid. 801(c) as:

 Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

 Hearsay is not admissible unless a hearsay exclusion or exception applies. Fed.R.Evid. 802 provides:

 Hearsay is not admissible except as provided by these rules or by other rules pre-

scribed by the Supreme Court pursuant to statutory authority or by Act of Congress.

6. Because the report contains hearsay within hearsay, it is only admissible if each hearsay element fits within an exception to the hearsay rule. See Fed.R.Evid. 805. This means that the report itself, which is being offered for the truth of the matters asserted by the report's writer, must fit within an exception, and the statements by others restated in the report must also fit within a hearsay exception. (See Pls.' Br., Ex. C at 2 (stating "[t]he Chief Operator stated ..." and "[t]he injured employee stated ...")). This Court, however, does not need to determine whether the individual statements within the report fit within a hearsay exception because the report itself does not.

ness activity; and (4) that such records were regularly kept by the business. *United States v. Furst,* 886 F.2d 558, 571 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990) (citing Fed.R.Evid. 803(6)).[7]

Plaintiffs argue that the reports should be excluded because they were not made in the regular course of business. (Pls.' Br. at 4.) In support of their argument, they cite *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943) in which the Supreme Court upheld the exclusion of an employee's report about an accident. The Court held that:

> it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like, these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading.

*Id.* at 114, 63 S.Ct. 477. The business records exception was not intended to "make admissible all evidence, no matter how incompetent or irrelevant, merely by virtue of the fact that it appeared in a business record." *Gordon v. Robinson,* 210 F.2d 192, 196 (3d Cir.1954). Instead, it was meant to "admit into evidence entries of a purely clerical or routine nature not dependent upon speculation, conjecture or opinion." *Id.* Courts have therefore found that the exception applies to business records which are reliable and trustworthy because the employee was motivated to be accurate because the business depends on accuracy of the record to conduct its affairs, and created the record in a habitual manner. *Certain Underwriters at Lloyd's London v. Sinkovich,* 232 F.3d 200, 205 (4th Cir.2000).

In *Palmer,* the Supreme Court found that the incident report was not trustworthy and was not admissible because (1) the business had motivation to skew the record because it was prepared in anticipation of litigation, and (2) the record was not routinely created, but was only created because of an unusual accident. *Palmer,* 318 U.S. at 111–14, 63 S.Ct. 477. The Third Circuit has cited *Palmer* for the proposition that the motivation of the report's writer is key to deciding whether the report is admissible under Rule 803(6). *Casoni,* 950 F.2d at 911, n. 10; *see also Sinkovich,* 232 F.3d at 205 (excluding report when "primary motive" for its creation was litigation).

Here, the report is not admissible as a record of a regularly conducted business because (1) it was prepared with the knowledge that the event could lead to litigation and (2) it was not routinely created. The report indicates the possibility of litigation by titling the document "recordable injury," by classifying the incident as "OSHA Recordable/Days Away Case," and by investigating the cause of an accident that left an employee with a "seriously"

---

7. Fed.R.Evid. 803(6) provides, in part:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
 (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . .

injured left ankle. (Pls.'s Br., Ex. C at 1.) The report also shows that the incident was not common, leading to the conclusion that the report was not routinely created. The report's title alone indicates that the report was made to document an "unusual incident." (*Id.*) The report also indicates that the chief operator on site stated that "he had performed this cleaning task several times in the past without incident, although this was the first time that the operation required work outside of the platformed dome area." (*Id.* at 2.) Additionally, the report includes an analysis of the consequences of behavior like plaintiff's and finds that the certain consequences of "working outside of the guarded area on top of a phthalic anhydride rail car without fall protection" are "job completed," "save time," and "meet deadline." (*Id.* at 4.) The uncertain consequences include "nothing bad happens" and "injury or death." (*Id.*) This Court finds that a report created after an "unusual incident" that occurred during the "first time that the operation required work outside the platformed dome area" and led to the "uncertain consequence" of "injury" is not a report made in the regular course of business.

▉▉▉ The report also does not fit within the hearsay exception for statements against interest, which requires proof (1) that the declarant is unavailable, and (2) that the statement is so far contrary to the declarant's pecuniary, proprietary or penal interest that "a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3);[8] *Blackburn*

*v. United Parcel Serv.*, 179 F.3d 81, 96 (3d Cir.1999).

This Court finds that the report is not a statement against interest because defendant has not shown either precondition. First, defendant has not shown that the writer of the report is unavailable to testify at trial. While the report itself does not indicate its author, counsel for defendant represented to this Court that it was written by Martin Rose, Solutia's Safety Supervisor. Even so, defendant did not represent that Martin Rose is unavailable as a witness or that his whereabouts are unknown. Instead, the record shows that Mr. Rose was available to complete an affidavit on May 29, 2001, (Pls.' Products Liability Br., Ex. H), and that Mr. Rose will testify for the plaintiff at trial, (Joint Final Pretrial Order at 11).

Second, defendant has not shown that the statement was against Mr. Rose's or Solutia's interest when made. An "essential predicate" for a statement against interest is that it "be objectively contrary to the declarant's interest." *United States v. Ashfield*, 735 F.2d 101, 110 (3d Cir.1984). Here, Mr. Rose made the statements during an investigation of the accident and thus, could "have been serving as a conduit for defenses" that could potentially be used by Solutia. *See id.* (stating that statement made after investigation had begun was likely not against interest, but was strategically made). Also, the report is really against plaintiff's interest, not Mr. Rose's or Solutia's. It states that the cause of the incident was plaintiff's "at-risk behavior of working at an elevated location

8. Fed.R.Evid. 804(b)(3) provides, in part:
 The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ...
 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

without fall protection." (Pls.' Br., Ex. C at 2.) It explains that corrective action should be taken to instruct "all employees" to avoid the behavior that plaintiff engaged in. (*Id.*) It recommends use of a contractor for future cleaning operations "which cannot be performed safely by plant personnel." (*Id.* at 4.) The focus of the report is on the plaintiff's actions as employee, not on Solutia's. As such, it is not a statement against interest by Solutia and is not admissible under the statement against interest exception to the hearsay rule.

Because the report does not qualify for any exception to the hearsay rule, this Court does not need to consider the hearsay within the report. This Court will grant plaintiffs' motion to bar admission of the Solutia "Unusual Incident" report from defendant's case in chief. Nothing precludes its use as potential impeachment material, or to refresh recollection of the witness, if its author testifies at trial.

## 2. Defendant's motion to preclude opinions of plaintiffs' expert.

Defendant seeks to exclude the opinions of plaintiffs' expert, George P. Widas, regarding plaintiff's products liability claim. (Def.'s Br. at 2.) Widas prepared two reports for plaintiffs: (1) a July 15, 2001 report that about Koppers' alleged negligence, and (2) a June 4, 2002 report about the products liability claim. In this motion, defendant only seeks to exclude the second report, arguing that Widas' methodology does not have sufficient reliability under the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (Def.'s Br. at 2.)

Under the Federal Rules of Evidence, a federal judge must serve as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but is also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir.1997) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). Rule 702,[9] which governs the admissibility of expert testimony, has a liberal policy of admissibility which requires (1) that the proffered witness be an expert; (2) that the expert testify about matters requiring scientific, technical, or specialized knowledge; and (3) that the expert's testimony assist the trier of fact. *Kannankeril*, 128 F.3d at 806. Here, defendant has not challenged Mr. Widas' qualifications. However, defendant challenges the reliability of Widas' methodology, arguing that he "has performed no scientific testing or analysis whatsoever nor has he relied upon any publication relating to railroad cars or railroad safety. He has provided no objective anchor for his conclusions." (Def.'s Br. at 14.)

The Supreme Court re-examined the trial judge's "gatekeeping" function under *Daubert* in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court found that when a party questions the expert's factual basis, data, principles, methods, or their application, Rule 702's "standard of evidentiary reliability" requires that the trial court "determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 149, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). The court must "make certain that an expert, wheth-

---

9. Fed.R.Evid. 702 reads, in part:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a
 fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...

er basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. The Third Circuit summarizes the nature of this inquiry as follows:

> In interpreting this second requirement, we have concluded that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." In order for the expert testimony to be "reliable," we have required that the testimony be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation." Moreover, *Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology. Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.

*Kannankeril,* 128 F.3d at 806–07 (internal citations omitted). The question, therefore, is whether the expert has good grounds for reaching his opinion. *Id.; Velasquez,* 64 F.3d at 849.[10]

■ The Supreme Court and the Third Circuit have identified several factors that a district court should consider when determining whether certain scientific methodology is reliable. *Kannankeril,* 128 F.3d at 806–07. These factors include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* at 806–07 n. 6 (citing *In re Paoli R.R. Yard Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994)). These factors are neither exhaustive nor applicable in every case. *Kannankeril,* 128 F.3d at 806–07. They should not be mechanically applied in Rule 702 inquiries; rather, the trial judge

> must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

*Kumho,* 526 U.S. at 152, 119 S.Ct. 1167.

■ Here, defendant argues that Widas' testimony is flawed because he did not rely upon published sources about railroad cars or railroad safety, did not test or develop an alternative design or alternative warning, and did not show that his methodology is generally accepted or has a known rate or error. (Def.'s Br. at 13.) This Court agrees that Mr. Widas' proposed products liability testimony is not reliable.[11]

**10.** It is important that in exercising its gatekeeper function the district court only address the admissibility of proffered expert testimony and not issues of credibility. *Kannankeril,* 128 F.3d at 809–10. The focus of the inquiry is on the "principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *see also* 29 Charles Alan Wright & Victor James Gold,

*Federal Practice and Procedure: Evidence* § 6266, at 271–72 (1997).

**11.** This Court finds that Mr. Widas' testimony is flawed for reasons other than because he did not rely on sources specific to railroad cars. This argument by defendant fails to acknowledge that Widas cited published sources relevant to the safety and transporta-

In products liability cases, courts generally look to the following non-exclusive indicia of reliability when considering expert testimony under Rule 702: whether the expert considered (1) federal design and performance standards, (2) standards established by independent standards organizations, (3) relevant literature, (4) evidence of industry practice, (5) product design and accident history, (6) illustrative charts and diagrams, (7) data from scientific testing, (8) the feasibility of any suggested modification, and (9) the risk-utility of any suggested modification. *Milanowicz v. The Raymond Corp.*, 148 F.Supp.2d 525, 536 (D.N.J.2001). The factors apply whether the defect alleged is a manufacturing defect, a failure to warn defect, or a design defect.[12] *Id.* at 536–41.

■■■ This Court finds that Mr. Widas' report is not reliable. First, he states that he relied on many sources to determine design standards, but he fails to link his conclusions to the standards. On the first three pages of the report, he references twenty-two sources and then gives a brief synopsis of some of the sources over the following nine pages, but he never connects the sources to the facts of this case. Instead he states:

> The failure of the designer/manufacturer of the subject product and/or container to assure, at the time of design and/or manufacture, that the product and/or container was safe in foreseeable

conditions of use, violated accepted safe practices, and violated readily available, recognized, accepted, authoritative references, standards and codes. . . .

> The failure to provide proper and adequate prominent, durable, permanent warnings of the hazardous, unsafe, dangerous, and defective condition violated accepted safe practices, and violated the readily available, recognized, accepted, authoritative references, standards and codes.

(*Id.* at 15–16.)

The District of New Jersey considered a similar situation in 2001 when an expert "list[ed] a number of design standards at the beginning of his report, [but did] not specifically reference any of them in the body of his report," and found that listing the sources did not alone provide an indicia of reliability. *Milanowicz*, 148 F.Supp.2d at 537. The same is true here. His conclusions were couched in broad, general terms, typified by his use of the slash:

> The failure of the designer/manufacturer of the subject product and/or container to assure, at the time of design and/or manufacture, that the product and/or container was safe in foreseeable conditions of use, created an unreasonably dangerous and defective product, and created the hazardous, unsafe and dangerous condition for serious injury. . . .

> 1. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or
> 2. failed to contain adequate warnings or instructions, or
> 3. was designed in a defective manner.
> N.J.S.A. 2A:58C–2.

---

tion of chemical products. (*See* Def.'s Br., Ex. A at 1–3.) The fact that Widas did not rely on railroad-specific publications does not indicate that his opinion is not reliable.

12. N.J.S.A. 2A:58C–2 provides:
A manufacturer or seller of a product shall be liable in a products liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it:

The hazardous, unsafe, and dangerous defective condition of the subject product and/or container could ... have been mitigated by readily available, economical, proper and adequate prominent, permanent, durable warnings on the railroad car/product container, as required by accepted safe practices, and as required by the cited safety references, standards and codes.

(Def.'s Br., Ex. A at 15–16.) In other words, his reasoning is entirely generic, resulting in an unsupported net opinion that the railcar and its contents constituted a defective product. Mr. Widas tried to clarify his reasoning during his deposition, but was unable to establish a clear connection between the sources he cites and the specific facts of this case. When asked if the "Product Safety Management Guidelines address railroad tank cars in any respect," he answered "I don't know. I never looked in it to find out what objects it references specifically." (Def.'s Br., Ex. B at Tr. 20:18–21:1.) Safety guidelines that are unread and unapplied give no reliable basis for an opinion. Likewise, when asked if he had seen "any articles, reports, publications or any documents of any kind which in any manner address the use of warnings" like he proposed on railroad cars, he answered "No." (*Id.* at Tr. 70:24–71:3.) When questioned about his use of the American National Standard Product Safety Signs and Labels source instead of the codes and regulations that pertain to railroad tank cars he stated that he did not "look into" the tank car requirements. (*Id.* at Tr. 33:15–34:8.) While he may have used many sources for their "general principles," (*see, e.g. id.* at Tr. 21:18), Third Circuit precedent is clear that he needed to show that he had "good grounds" for his conclusions. *See Kannankeril,* 128 F.3d at 806–07. Instead, like the expert in *Milanowicz,* 148 F.Supp.2d at 538, he only included synops-

es of his sources which stated "rather uncontroversial propositions that the elimination of identifiable, foreseeable hazards is a fundamental concern in industrial design and that users be warned of those hazards which have not been eliminated." Therefore, like the *Milanowicz* court, this Court finds that his unexplained citations to design and performance standards do not show that his opinion is reliable.

Second, Mr. Widas failed to suggest modifications, alternative designs, or alternative warnings that would create a safer product. Expert testimony is generally needed as proof of an alternative warning and a reasonable alternative design to "help the fact-finder understand 'the mechanical intricacies of the instrumentality.'" *Rocco v. N.J. Transit Rail Operations,* 330 N.J.Super. 320, 341, 749 A.2d 868 (App.Div.2000) (quoting *Jimenez v. GNOC, Corp.,* 286 N.J.Super. 533, 546, 670 A.2d 24 (App.Div.1996)). The Third Circuit has specifically held that expert testimony which concludes that warnings are "deficient in placement, design, orientation, and content" is unreliable if the expert has not "created or even designed a warning device which would have been more appropriate [or] tested its effectiveness," has not read the warnings which were present on the product, and has not pointed to other manufacturers using better warnings. *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1084 (8th Cir.1999).

Mr. Widas' deposition indicates that he did not propose an alternative warning or know if one would avert an accident like the one that plaintiff suffered:

Q: Have you designed the type of warning that you think is necessary here?

A: Putting a warning on this railroad car is the last thing you want to do. Just clean the spills up before they

leave the yard. No, I did not take the time to design the warning....

Q: Do you know of any tank car in the railroad industry that has such a sign?

A: No.

Q: Do you know if any railroad car has put a warning sign like this on any of its railroad cars? ...

A: I don't know....

Q: Have you performed any type of testing to see whether the warnings you propose would prevent railroad workers from actually walking on top of railroad tank cars?

A: Not personally.

(Def.'s Br., Ex. B., Tr. 67:8–71:8.) In addition, neither Widas' report nor Widas' testimony includes any proposed alternative design that would make the PAA tank car a safer product.

For these reasons, this Court finds that the June 4, 2002 report of Mr. Widas is unreliable and the testimony associated with it will be inadmissible. It fails to present evidence for a products liability case that could reliably assist the trier of fact in reaching a conclusion. As a net opinion, the report is supported only by the personal view of its author, and not by reliable, verifiable methodology pertaining to the product at issue here. Therefore, this Court will grant defendant's motion to exclude the June 4, 2002 report of plaintiff's expert.[13]

### 3. Defendant's motion to admit evidence regarding plaintiff's conduct at trial.

Defendant Koppers seeks to admit evidence at trial about plaintiff's conduct at the time of the accident. (Def.'s Br. at 1.) Plaintiffs argue that such conduct evidence cannot be considered with regard to the products liability claims. (Pls.' Br. at 3.)

It is clear that plaintiff's conduct is relevant and admissible to the claims of negligence that plaintiffs assert against Koppers. Plaintiffs have not contested that evidence of plaintiff's conduct is relevant to the negligence issues of causation, comparative negligence, avoidable consequences, superseding and intervening causes, and open and obvious conditions. The issue here is whether evidence about plaintiff's conduct can be considered with regard to his strict liability claim. This Court finds that evidence of plaintiff's conduct has limited admissibility for the strict liability claims.

In a strict products liability action, the plaintiff must show (1) the defendant is the manufacturer (2) of a product that is defective, (3) that the defect existed when the product left the defendant's control, (4) that a reasonably foreseeable user was injured, and (5) that the defect was the proximate cause of the plaintiff's injury. *Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 675 A.2d 620 (1996). Evidence of the plaintiff's negligence can be used as proof that the fifth factor is not met because the defect was not the proximate cause of the plaintiff's accident since plaintiff's conduct was the sole proximate cause. *Johansen v. Makita U.S.A., Inc.,* 128 N.J. 86, 102, 607 A.2d 637 (1992); *see also Grier v. Cochran Western Corp.,* 308 N.J.Super. 308, 324, 705 A.2d 1262 (1998). Evidence of plaintiff's negligent conduct, however, is not admissible to show the second factor—that the product is defective.[14] *Johansen,* 128 N.J. at 100–02, 607 A.2d 637. Evi-

---

**13.** This motion only relates to Mr. Widas' June 4, 2002 report which was prepared for plaintiffs about their products liability claim. It does not affect Mr. Widas' July 15, 2001 report that he prepared about the negligence claim.

**14.** This limitation is not relevant to the present case because this case is a manufacturing

dence of plaintiff's conduct is also not admissible as a comparative negligence defense if the products liability case involves a workplace injury. *Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 167–68, 406 A.2d 140 (1979) (holding comparative negligence inapplicable when employee is injured by defect in industrial machine used for its intended or foreseeable purpose); *see also Johansen*, 128 N.J. at 95, 607 A.2d 637 (explaining that comparative negligence does not apply to products liability action because industrial employees have no choice but to use product to complete assigned task).

The limited admissibility of evidence about plaintiff's conduct in a strict liability action should be handled with care to ensure that the jury only considers the actions for the appropriate inquiry. *Johansen*, 128 N.J. at 98–99, 103, 607 A.2d 637; *see also Grier*, 308 N.J.Super. at 323, 705 A.2d 1262 (stating that it is easy to "mix and confuse interrelated but nonetheless distinct concepts"). The New Jersey Supreme Court has stated that:

> a cautionary instruction accompanying the admission of the evidence would have been appropriate. It could have included a repetition of the standard instruction that the jury refrain from making any findings or drawing any conclusions with respect to such evidence until the close of the case and the court's final instructions to the jury before its deliberations. It also could have alerted the jury that evidence of plaintiff's conduct had only limited relevance in strict-products-liability litigation, and that its relevance would be explained as part of the comprehensive instruction at the

close of the case. Such a cautionary instruction would have reduced the risk of the improper use of the evidence and would have assisted the jury in evaluating the significance of the evidence adduced at trial.

*Johansen*, 128 N.J. at 98–99, 607 A.2d 637. Following the presentation of evidence, the New Jersey Supreme Court stated that the trial court should instruct the jury

> that evidence of plaintiff's method of operating the [product] was neither a defense to plaintiff's strictproducts-liability claim nor relevant to the jury's application of the fifth factor of the risk-utility analysis [used to determine whether the product was defective]. Such evidence could have been considered, however, in determining whether the specific manner in which plaintiff had operated the [product] had been the sole cause of the accident.

*Id.* at 103, 607 A.2d 637.

■ Therefore, because defendants seek to present evidence of plaintiff's conduct to prove that it was the "sole cause of the accident and his resultant injuries," (Def.'s Br. at 3), this Court will allow the admission of such evidence, provided an appropriate limiting instruction is given with respect to the products liability issue of causation. No limitation is placed on consideration of plaintiff's conduct with respect to the negligence claim.

**4. Defendant's motion to dismiss plaintiffs' cause of action and damage claim.**

■ Defendant Koppers moves to dismiss plaintiffs' cause of action for

---

defect case and not a design defect case. In design defect cases, New Jersey follows a seven-part risk utility analysis to determine whether the design is defective. *Johansen v. Makita U.S.A., Inc.*, 128 N.J. 86, 95, 607 A.2d 637 (1992). The fifth factor of the analysis considers "the user's ability to avoid danger

by the exercise of care in the use of the product." *Id.* at 96, 607 A.2d 637. Evidence of plaintiff's conduct and care in using the product is irrelevant to the determination of the fifth factor because the focus is on whether the product was defective when marketed, not when used. *Id.* at 101, 607 A.2d 637.

negligence based on the doctrines of (1) proximate causation, (2) superseding and intervening causes, (3) open and obvious conditions, and (4) avoidable consequences. (Pls.' Br. at 1.) Defendant previously sought dismissal of this cause of action in its July 6, 2001 motion for summary judgment.[15] This Court denied defendant's motion for summary judgment on January 16, 2002, stating:

> While defendant may succeed before the trier of fact on one or all of their theories to limit or preclude liability and/or damages at trial, it is not appropriate to decide those issues upon the existing record on summary judgment. *Because plaintiffs have shown that a genuine issue of material fact remains to be determined about the causation of plaintiff Albert Ebenhoech's fall, summary judgment is inappropriate for the defendant at this time, and plaintiff's claim will proceed to trial,* where he will bear the burden of proving his claims to the finder of fact by a preponderance of the evidence, and defendant can present its theories that plaintiff, not defendant was responsible for his injuries.

(*Id.* (emphasis added)). Defendant points to no intervening change of New Jersey law or of the factual circumstances of this case which would warrant reconsideration of this determination. At argument, counsel for defendant stated that he raised the avoidable consequences, superceding or intervening cause, and open and obvious condition arguments again at this stage, not because they were new, but because he wanted to ensure that the Court was aware of his objections. He also stated

that defendant was raising a new issue in this motion because it added the argument that plaintiff has not shown that the PAA spill was the proximate cause of plaintiff's injury because

> [p]laintiff's actions, in ignoring the safety provided by the domed platform area and in walking on an unprotected, rounded, slippery, elevated surface, while using a fifty-five gallon drum out of which liquid was flowing, cannot be considered to be a foreseeable event.

(Def.'s Br. at 5.) However, defendant did argue in its motion for summary judgment that:

> [s]ome things are just self-evident, especially these circumstances involving an experienced worker, who has been involved in cleaning tank cars many times in the past. Reasonable minds could not differ on the question of whether this plaintiff knew and appreciated the risk he was taking by working at these heights, on a slippery surface, with no personal fall protection.

(1/16/02 Opinion at 10–11.) Defendant also argued that it could not have foreseen that plaintiff would have to clean the spill by using the "absurdly dangerous process of allowing a liquid mixture to flow over the top of the tank car," and then walking on its smooth slippery surface. (*Id.* at 13.) At that time, this Court considered the arguments and determined that:

> this Court finds that a reasonable jury could very well conclude that Koppers negligently caused the chemical PAA to be spilled on the side of their rail tank car and failed to clean it, and that defen-

---

**15.** This Court explained defendant's motion for summary judgment at that time as follows:

> Defendant Koppers asserts that summary judgment is proper because plaintiff is barred from recovering damages for his injuries 1) under the doctrine of avoidable consequences, 2) because plaintiff's own ac-

tions were the superceding, intervening cause of the accident, and 3) because the chemical spill which plaintiff alleges caused his injuries was an open and obvious condition and plaintiff assumed the risk of injury when he attempted to clean the PAA spill. (1/16/02 Opinion.)

dant negligently permitted the rail car to be shipped to plaintiff's employer's facility where it was foreseeable that plaintiff would have to undertake the cleanup task, and that plaintiff's fall was foreseeable and caused by that negligence.

(*Id.* at 15.) Therefore, this Court will deny defendant's motion to dismiss plaintiff's negligence cause of action and the claim will proceed to trial where the jury will be called upon to decide the proximate cause of the accident, whether the plaintiff's actions were a superceding or intervening cause, whether plaintiff confronted an open and obvious condition, and whether the defendant can block recovery under the doctrine of avoidable consequences.

### 5. Defendant's motion to strike plaintiffs' products liability claim.

■ Defendant Koppers moves to dismiss plaintiffs' products liability claim arguing that Koppers is not a manufacturer, designer, or seller, that there is no defective product involved, that there is no proof that the product was defective when it left the control of Koppers, that plaintiff was not a reasonably foreseeable user, and that plaintiffs' pleadings do not allege facts to sustain a products liability cause of action. (Defs.' Br. at 2.) This Court must make this inquiry based on a record which excludes the Solutia Unusual Incident Re-

port and the Widas June 4, 2002 expert report.[16]

■ New Jersey's Products Liability Act was passed as "remedial legislation to establish clear rules [in] ... actions for damages for harm caused by products." N.J.S.A. 2A:58C–1. It imposes a duty on manufacturers to produce a defect-free product, regardless of fault. *See Oscar Mayer Corp. v. Mincing Trading Corp.,* 744 F.Supp. 79, 84 (D.N.J.1990)(citing *Waterson v. General Motors Corp.,* 111 N.J. 238, 267–68, 544 A.2d 357 (1988)). To prevail on a products liability action, plaintiff must show: (1) that defendant is a manufacturer (2) that the product was defective, (3) that the defect existed when the product left defendant's control, (4) that a reasonably foreseeable user was injured, and (5) that the defect was the proximate cause of the plaintiff's injury. *Zaza,* 144 N.J. at 34, 675 A.2d 620. This Court finds that questions of fact remain on whether Koppers is liable under a products liability cause of action. Thus, this Court will deny defendant's motion and will allow the products liability claim to proceed to trial.

■ First, defendant fits within the terms of the Act. The New Jersey Products Liability Act requires that the defendant be either a "manufacturer" or "product seller." N.J.S.A. 2A:58C–2. The Act defines "manufacturer" to include "any person who designs, formulates, produces,

---

**16.** Plaintiff can proceed with a manufacturing defect case even though this Court has excluded Mr. Widas' testimony. The Supreme Court of New Jersey has held that the plaintiff may show the defect through expert testimony or circumstantial evidence. *Myrlak v. Port Authority of N.Y. and N.J.,* 157 N.J. 84, 97, 723 A.2d 45 (1999). The New Jersey Supreme Court explained it as follows:

Establishing this element requires only proof, in a general sense and as understood by a layman, that "something was wrong" with the product. As a rule, the mere occurrence of an accident is not sufficient to establish that the product was not fit for ordinary purposes. However, additional circumstantial evidence, such as proof of proper use, handling, or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with it. Further, a defective condition can also be proven by the testimony of an expert.

*Scanlon v. Gen'l Motors Corp.,* 65 N.J. 582, 591, 326 A.2d 673 (1974). Therefore, the inadmissibility the June 4, 2002 Widas report does not eliminate plaintiff's products liability claim.

creates, makes, packages, labels, or constructs any product or component of a product," and defines "product seller" to include "any person who, in the course of a business conducted for that purpose sells, distributes, leases ... packages ... or otherwise is involved in placing a product in the line of commerce." N.J.S.A. 2A:58C–8. Therefore, because defendant has stated that it "manufactured a chemical substance known as phthalic anhydride, which it loaded onto a railroad tank car which was leased to Koppers," (Def.'s Br. at 3.), it fits within the statute's definition of manufacturer and of product seller.

■ Second, Koppers sold a product that a reasonable factfinder could find was defective. In a products liability action, the focus is on the product as there can be no recovery unless there is a product that is defective. *Zaza*, 144 N.J. at 48–49, 675 A.2d 620. During oral argument, counsel for plaintiffs argued that the PAA, spilled on the side of the tank car, created a defective product consisting of the PAA and its container. Counsel for defendants, however, argued that there is no defective product in this case because there is no product except for the PAA, which all agree was not defective. Defendant argues that any problem with how the PAA was packaged is a question of negligence, not of products liability. The Court must examine whether the packaging of a product, in this case the PAA in a returnable

tank car, is governed by New Jersey's products liability statute.

■ There are three types of product defects in New Jersey: (1) manufacturing defects, (2) failure to warn defects, and (3) design defects. N.J.S.A. 2A:58C–2;[17] *Port Authority of N.Y. and N.J. v. Arcadian Corp.,* 991 F.Supp. 390, 399 (D.N.J. 1997).[18] A product is "deemed to be defective if it is not reasonably fit, suitable, or safe for the ordinary and foreseeable purpose for which it is sold." *Myrlak,* 157 N.J. at 97, 723 A.2d 45 (citing *Waterson v. Gen'l Motors Corp.,* 111 N.J. at 238, 267, 544 A.2d 357 (1988)).

A manufacturing defect is a deviation "from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." *Myrlak,* 157 N.J. at 96, 723 A.2d 45 (quoting N.J.S.A. 2A:58C–2a). It occurs when the "product comes off the production line in a substandard condition based on the manufacturer's own standards or identical units that were made in accordance with the manufacturing specifications." *Id.* at 98, 723 A.2d 45. "Common examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled." Restatement (Third) of Torts § 2 (comment).

■ The defect in the product can be a defect in its packaging. *See Levondo-*

---

17. *See* note 12, *supra.*

18. Plaintiffs have broadly argued that strict liability applies without narrowing their focus to a manufacturing defect claim. As noted *supra,* though, plaintiffs' expert concluded that the product suffered from a manufacturing defect, a design defect, and a failure to warn defect. (Def.'s Expert Opinion Br., Ex. A at 16.) Plaintiffs have not presented any other evidence of a failure to warn or a reasonable alternative design. Therefore, this

Court has only considered the merits of a manufacturing defect claim. To the extent plaintiffs have argued some sort of design defect or failure to warn defect, those theories are unsupported by the evidence in this case, and only the manufacturing defect claim may go forward. Since the claims for design and warning defects are legally insufficient, they must be stricken and defendant's motion to strike is granted to this limited extent.

*sky v. Marina Assoc.*, 731 F.Supp. 1210, 1214 (D.N.J.1990) (finding glass was "part and parcel" of the drink ordered by plaintiff); *Corbin v. Camden Coca–Cola Bottling Co.*, 60 N.J. 425, 434, 290 A.2d 441 (1972) (finding reasonable jury could conclude carton was defective when plaintiff was injured by bottle that fell through it).[19] The defect in the packaging can still form the basis of a products liability action if, as in the present case, the packaging is to be returned to the seller or distributor. *See Levondosky*, 731 F.Supp. at 1214 (finding products liability cause of action when drink was served in chipped glass even though plaintiff was to return the glass for its reuse); *see also Robertson v. Gulf South Beverage, Inc.*, 421 So.2d 877, 878–80 (La.1982) (finding products liability cause of action when returnable soda bottle was defective).

While many packaging cases deal with glass soda and beer bottles and cardboard cartons, the Supreme Court of Pennsylvania considered a case in which the defendant shipped chemicals to the plaintiff's employer. *Saganowich v. Hachikian*, 348 Pa. 313, 35 A.2d 343 (1944). There, the defendant had supplied plaintiff's employer with an iron drum of liquid caustic soda. *Id.* at 345. The drum container was supplied by the defendant and was to be returned to the defendant as soon as plaintiff's employer emptied it of the caustic soda. *Id.* at 345. When plaintiff, working in the stockroom, tried to open the drum to empty it of its contents, the plug "shot out," sprayed plaintiff with caustic soda, and caused him to lose sight in one eye.

*Id.* at 344–45. After the jury awarded plaintiff $12,000 for his injuries, the Supreme Court of Pennsylvania considered the case on a motion for judgment notwithstanding the verdict. *Id.* at 345. The court found that the jury was warranted in finding liability based on the container's defective plug, and affirmed the verdict. *Id.*

Defendant argues, though, that this Court should follow *Elk Corp. v. Jackson*, 291 Ark. 448, 727 S.W.2d 856 (1987), where the Supreme Court of Arkansas did not allow a products liability cause of action for defective packaging. There, a truck driver brought the products liability claim when rolls of roofing on his tractor trailer shifted and caused the rig to overturn. *Id.* The Court held that the rolls of roofing, bound with one metal band, were not a "product" for purposes of products liability law. *Id.* at 857. In its decision, the Court distinguished the situation from that in which the package is an "integral part of the product and its use," stating that:

> If a shipper's act of banding together rolls of roofing for loading on a tractor-trailer could be considered "packaging" in the same way that a coca-cola carton is a package for that product, then [plaintiff] would be correct in asserting that this cause of action is covered by [strict liability law].... *Stalter [v. Coca–Cola Bottling Co.*, 282 Ark. 443, 669 S.W.2d 460, 464 (1984) (where plaintiff had valid cause of action when injured by glass bottle that fell through bottom of soda carton)] cannot be interpreted to extend strict product liability to include

---

**19.** *See also Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 329 (Iowa 1996) (stating that when bottle explodes, "defect is so obvious as to warrant little or no discussion"); *Van Duzer v. Shoshone Coca Cola Bottling Co.*, 103 Nev. 383, 741 P.2d 811, 813–14 (1987) (finding strict liability cause of action for bottle defect when bottle exploded in plaintiff's

check-out line); *Stalter v. Coca–Cola Bottling Co.*, 282 Ark. 443, 669 S.W.2d 460, 464 (1984) (finding cause of action for product defect when plaintiff was injured by glass bottle that fell through soda carton); *Falstaff Brewing Corp. v. Williams*, 234 So.2d 620, 624 (Miss. 1970) (affirming strict liability award based on exploding beer bottle).

the process by which the shipper secures a product for transportation. *Stalter* involved the ultimate consumer of the product carrying the soft drinks in the carton sold with the soft drinks ... In this case, putting a band around ... the rolls of roofing, was simply to secure the load for shipping.... In *Stalter* the plaintiff could clearly point to the carton as the defective part of the product. Here, it was the *act* of negligently securing the rolls ... that [plaintiff] alleges caused the accident.

*Id.* (emphasis in original).

This Court finds that this case is more analogous to the coca-cola carton in *Stalter* than to the banded rolls of roofing in *Jackson.* The *Jackson* court considered a situation where individual products were shipped together on a truck and found that together the individual products did not create one composite product. Each piece of roofing could have been transported separately, but was shipped together for convenience. An analogous situation may occur when individual bottles of soda are packed onto one trailer for shipment. If the bottles were inappropriately packed onto the rig and caused an accident during transportation, an action may lie only in negligence. However, once the bottles reach their destination, if a consumer picks up one bottle of soda and it explodes, the courts almost universally agree that it "warrants little or no discussion" that the consumer may bring a products liability cause of action based on the defective bottle. *Bredberg,* 551 N.W.2d at 329. Further, in *Jackson,* the injured plaintiff was not the consumer of the roofing material.

▮ Here, defendant does not dispute that the only way for the chemical product to be delivered to the consumer was in the tank car as defendant's brochure states that the available containers for the molten form of PAA are the "20,000 gallon tank car" and the 4,000 gallon "stainless steel tank truck." (Pls.' Br., Ex. D at 4.) The tank car here is an integral part of the product. The PAA cannot be sold and distributed to users without it. It holds the PAA until the purchaser can use the product or unload it into a storage tank. Without the tank car, the PAA, a combustible material that must be blanketed with inert gas and kept below its 151 degree Celsius flash point, cannot be shipped to the consumer. (*Id.* at 6.) In this way, it is like soda that must be contained in a bottle. The PAA container may be much larger and more complex than the soda bottle, but it serves the same function. It holds the liquid until the consumer can remove it from the container and use it or store it in another container. In both situations, the product cannot be transported from manufacturer to consumer or enjoyed without this special type of container. The injured employee of the consumer of this product lies squarely in the zone of products liability protection. Therefore, this Court finds that the tank car packaging of the PAA constitutes a product for strict liability purposes and plaintiffs can use it as a basis for a manufacturing defect claim.

▮ Plaintiffs have also shown that questions of fact exist as to whether the product was defective. A product suffers from a manufacturing defect when it is delivered "in a substandard condition based on the manufacturer's own standards or identical units that were made in accordance with the manufacturing specifications." *See Myrlak,* 157 N.J. at 98, 723 A.2d 45. Plaintiffs have submitted Koppers' standards in the form of its PAA brochure. (Pls.' Br., Ex. D.) The brochure's section on "Customer Environmental Responsibilities" states, in pertinent part:

1. Due to the physical and chemical properties of PAA, all shipments are transported as *hazardous materials* and should be handled accordingly. . . .

3. As manufactured and shipped by Koppers, PAA is a hazardous substance, but it is not a *hazardous waste.*

6. If PAA is spilled and/or released into the environment, or discarded, or intended for discard, it becomes a hazardous waste at that time . . .

8. The person, by site, whose act or process *first* causes a hazardous waste . . . is a *hazardous waste generator*

9. The proper management and disposal of hazardous waste materials is the responsibility ˙of the generator.

(*Id.* at 11 (emphasis in original.)) The brochure also states that one "countermeasure" in the event of a release is to "[r]ope off the area and start clean-up activities as soon as possible." (*Id.*) Therefore, due to the hazardous nature of PAA, the shipment of a tank car with the residue of a PAA release on its exterior could reasonably be ·found to be defective when compared to Koppers' own hazardous waste standards. As a result, this Court finds that questions of fact remain about whether the product was defective.

■ The third factor in a products liability cause of action is whether the defect existed when the tank car left the defendant's control. Defendant argues that the spill could have occurred after the tank car left Koppers on October 16, 1998 and before or after it arrived at Solutia on October 30, 1998. (Def.'s Br. at 5.) In support of its position, it offers an October 30th Phthalic Tank Car Unloading Checklist where Solutia signified its acceptance of the ʼtank car upon delivery and did not note any spill. (Def.'s Br., Ex. B.) Plain-

tiffs, however, argue that the nature of PAA shows that the spill must have occurred when the PAA was loaded into the tank car by Koppers. (Pls.' Br. at 6.) In support, plaintiffs present Koppers' brochure which states that PAA must be heated to its molten form to be loaded into the tank car. (Pls.' Br., Ex. D at 4.) The PAA then solidifies within the tank car and must be heated at the time of unloading. (*Id.* at 6.) Plaintiffs therefore argue that the only time a liquid spill could have occurred was when the PAA was molten, and that the only time the liquid was molten before it reached Solutia was when Koppers loaded it into the tank car. (Pls.' Br. at 6.) They also present photographs of the tank car's condition upon its arrival at Solutia, (Pls.' Br., Ex. E), and affidavits of Solutia workers that noted a chemical spill upon arrival at Solutia, (Pls.' Br., Exs. F, G, H), to show that the spill occurred before the car reached Solutia.

This Court finds that a question of fact remains about where the spill occurred. While the brochure indicates that PAA solidifies within the tank car, it also states that the "PAA usually remains molten for at˙least 24 hours after leaving the plant." · (Pls.' Br., Ex. D at 4.) This Court, thus, cannot determine on this motion in limine whether the PAA spill occurred before the tank car left Koppers' control, during the first twenty-four hours that the PAA was transported, or during the unloading of the PAA by Solutia.

■ The fourth element of a products liability cause of action is whether the injured plaintiff was a reasonably foreseeable user. Defendant argues that Solutia's cleaning process was unconventional, and thus, unforeseeable. (Def.'s Br. at 6.) Plaintiffs argue that Koppers could foresee that someone would need to clean the tank car when it shipped the tank car with a

spill on its exterior. (Pls.' Br. at 7.) Such questions of reasonableness and foreseeability are questions for the jury. Here, where the record shows that Koppers' brochure states that when PAA is spilled "clean-up activities" should start "as soon as possible," (Pls.' Br., Ex. D. at 11), this Court finds that there remains a question of fact about whether Koppers could reasonably foresee that a PAA spill would cause a plaintiff to attempt to clean up the PAA.

 The fifth element of a products liability cause of action is whether the defect was the proximate cause of plaintiff's injuries. Defendant argues that the defect did not cause plaintiff's injury, but that plaintiff's negligent actions were the sole proximate cause of the accident. This Court cannot determine this issue on the present record. This Court considered the cause of the accident for negligence purposes in its January 16, 2002 summary judgment opinion. There, the Court found that "it is for a jury to decide whether the spill or plaintiff's actions or both were a substantial cause of the fall." (1/16/02 Opinion.) Defendant has not shown any new facts that change this determination. Even though it may be doubtful that plaintiff can prove that the defective product, as opposed to his own conduct and that of Solutia in addressing the obvious defect, was the cause of his accident, the judge is not permitted to weigh evidence at this phase but must extend all favorable inferences to plaintiff. A factfinder will have to decide whether plaintiff's actions were the sole cause of the accident.

Because questions of fact remain as to the elements of a products liability cause of action, this Court will deny defendant's motion in limine to strike plaintiffs' products liability cause of action and the claim will continue in the regular course to trial.

## III. CONCLUSION

For the reasons stated in this Opinion, this Court will grant the three evidentiary motions by finding that the Solutia Unusual Incident Report and the Widas expert report are inadmissible and that the evidence of plaintiff's conduct is admissible for limited purposes. This Court will deny the two motions to dismiss and will allow plaintiff's negligence and products liability causes of action to proceed to trial. The products liability claim, however, will be limited to manufacturing defect, and claims arising from design defect or defective warning will be dismissed.

The accompanying Order is entered.

### *ORDER*

This matter having come before the Court upon the motion of plaintiffs to bar testimony of, or admission into evidence of, various incident reports of plaintiff's employer and testimony or evidence of the amount of plaintiff's lump sum retirement payment, [Docket Item 32–1], and the motions of defendant to strike plaintiffs' products liability claim, [Docket Item 34–1], to dismiss plaintiffs' cause of action and damage claim, [Docket Item 35–1], to strike plaintiffs' claim of future wage loss and preclude evidence thereof, [Docket Item 36–1], to admit evidence regarding plaintiff's conduct at trial, [Docket Item 37–1], to preclude opinions of plaintiffs' expert, [Docket Item 38–1], and to deem its requests for admissions be admitted, [Docket Item 41–1]; and the Court having considered the parties' written submissions as well as oral arguments made on November 15, 2002; and for the reasons expressed in Opinion of today's date;

**IT IS** this 24th day of December, 2002, hereby

**ORDERED** that plaintiffs' motion to bar testimony of, or admission into evi-

dence of, various incident reports of plaintiff's employer and testimony or evidence of the amount of plaintiff's lump sum retirement payment [Docket Item 32–1] be, and hereby is, *DISMISSED IN PART AS MOOT* to the extent that it pertains to Solutia's November 3, 1998 "employer's first report of accidental injury or occupational illness," to Solutia's November 3, 1998 web-based injury report, and to testimony and evidence about the amount of plaintiff's lump sum retirement payment, and is *GRANTED IN PART* to the extent that it seeks to bar admission into evidence of Solutia's unusual incident report;

IT IS FURTHER ORDERED that defendant's motion to strike plaintiffs' products liability claim [Docket Item 34–1] be, and hereby is, *DENIED* as to any claim of a manufacturing defect, and it is *GRANTED* as to claims of design defect and defective warning;

IT IS FURTHER ORDERED that defendant's motion to dismiss plaintiffs' negligence cause of action and damage claim [Docket Item 35–1] be, and hereby is, *DENIED;*

IT IS FURTHER ORDERED that defendant's motion to strike plaintiffs' claim of future wage loss and preclude evidence thereof [Docket Item 36–1] be, and hereby is, *DISMISSED AS MOOT;*

IT IS FURTHER ORDERED that defendant's motion to admit evidence regarding plaintiff's conduct at trial, [Docket Item 37–1] be, and hereby is, *GRANTED* subject to the limitations explained in the Opinion of today's date;

IT IS FURTHER ORDERED that defendant's motion to preclude the June 4, 2002 report of plaintiffs' expert, George P. Widas, [Docket Item 38–1] be, and hereby is, *GRANTED;* and

IT IS FURTHER ORDERED that defendant's motion to deem its requests for admissions be admitted [Docket Item 41–1] be, and hereby is, *DISMISSED AS MOOT.*